## COUNTY OF CHITTENDEN,

DECEMBER TERM, 1849.

[Continued from Volume 22, page 594.]

---

PRESENT,

HON. STEPHEN ROYCE, CHIEF JUDGE.
HON. MILO L. BENNETT,
HON. DANIEL KELLOGG, } ASSISTANT JUDGES.
HON. HILAND HALL,

---

## STATE v. JOSEPH CROTEAU.

*License Law. Proof of offences. Right of jury to decide law.*

Upon the trial of an indictment, in several counts, for violations of the license law by the sale of spirituous liquors, it is not error in the county court to permit the prosecutor, after having given evidence tending to prove as many distinct breaches of the law by the respondent, within the time covered by the indictment, as there are counts in the indictment, to proceed and prove other sales within the same period of time,—as held in *State v. Smith*, 22 Vt. 74.

It was anciently the acknowledged province of the jury, in civil as well as criminal cases, to decide all questions of law, as well as of fact, which were involved in an issue to the country.

State *v.* Croteau.

The legal maxim, "*ad questionem facti non respondent judices, ad questionem legis non respondent juratores,*" had reference only to such questions of law or fact, as appeared on the record. The purport of it was, that issues of fact should be decided by the jury, and issues of law by the court; it being as much the province of the jury to decide the whole issue committed to them, as for the judges to determine that which was joined to the court.

For a wrong verdict in civil actions, whether the error were in regard to the facts of the issue, or in the application of the law to the facts, the jury were alone responsible upon the process of attaint; and they could not excuse themselves from such responsibility by following the directions of the judges in regard to the law. And while the process of attaint continued in use, there was no mode of disturbing a verdict for error in the directions of the judges to the jury, either by bill of exceptions, or otherwise.

By the modern practice of granting new trials in civil suits, for a difference of opinion between the court and jury upon matter of law, and of allowing bills of exceptions for misdirection of the judge, juries have become subject to the control of the court in regard to the law, and are, consequently, now, in such suits, the proper judges of the facts only.

But in criminal prosecutions the ancient common law right of the jury, in favor of the prisoner, to determine the whole matter in issue,—the law as well as the fact,—remains unimpaired. BENNETT, J., dissenting.

The right of a jury to find not only the fact of the issue, but to decide upon its criminality, was, in England, essential to the protection of innocence and the preservation of liberty, and for that reason has been maintained and preserved.

Where political power is conferred, either by statute or the common law, on a tribunal, without restriction or control from any other authority, such power may be lawfully exercised ; such power has been conferred on the jury in criminal trials, in respect to the determination of the law,—since the remedy by new trial has never been extended to a verdict of acquittal in a criminal prosecution,—and they have, consequently, a legal right to exercise it. BENNETT, J., dissenting.

In criminal trials it is the *duty* of the judge to aid the jury by giving them his opinion in regard to the law involved in the issue; and it is *the right* of the jury, in favor of the prisoner, to determine the law as well as the facts by their general verdict.* BENNETT, J., dissenting.

INDICTMENT, in three counts, for violations of the license law of 1846. Trial by jury, March T., 1848,—BENNETT, J., presiding.

---

* See *State* v. *Woodward, post,* Chittenden Co., December Term, 1850.

State *v.* Croteau.

On trial the attorney for the government introduced testimony tending to prove three distinct sales of spirituous liquors by the respondent at different times, and then offered farther testimony tending to prove sales of spirituous liquors by him at other times. To this last testimony the respondent objected; but it was admitted by the court.

The counsel for the respondent, after having argued to the jury the questions of law as well as of fact, requested the court, among other things, to charge the jury, that, this being a criminal trial, all the questions of law and fact arising in the case were exclusively within the determination of the jury, and that they were the paramount judges both of the law and the facts.

The court did not so charge the jury; but, after stating to the jury the principles of law, which should govern the prosecution, in a manner that was satisfactory to the respondent, and to which there was no exception, proceeded to say to the jury, that it was their duty to receive the law from the court, and to conform their judgment and decision to the instructions which the court had given them, in applying the law to the facts of the case, as they should find them; that they alone were responsible for a correct finding of the facts; but that it was not within the legitimate province of the jury to revise the decision of the court in regard to the matters of law, which the court have given them in charge, and return a verdict in violation of and contrary to the instructions which they received; but it was their duty faithfully to conform to such instructions.

The jury returned a verdict of guilty upon each of the counts. Exceptions by respondent.

*D. A. Smalley* for respondent.

This being a criminal prosecution, the court erred in charging the jury, that they were not judges of the law of the case, but must follow the direction of the court. This, we insist, is in direct opposition to one of the oldest and best settled principles of the common law. An examination will show, that the charge of the court contravenes all authority upon the subject, both English and American, (with two exceptions) from the Year Books to 1835.

It is admitted, that the judges are the constitutional advisers of

the jury, and that the jury should pay great respect to their opinion; but the jury should never compromise their oaths by following the judges, when clearly convinced, that the charge of the court was wrong. Co. Litt. 228. 4 Bl. Com. 361. *Bushel's Case*, decided 22 Charles II, cited by KENT, J., in *People* v. *Crosswell*, 3 Johns. Cas. 369. *Trial of the Seven Bishops*, 4 Harg. St. Tr. 395, (1688.) *Rex* v. *Woodfall*, 5 Burr. 2661, (1770.) 1 Chit. Cr. L. 520. *Henfield's Case*, ·Wharton's St. Tr. 87, (1793.) The Sedition Law, passed in 1798, declares, that the jury shall have a right to determine the law and the facts, as in other cases. Whart. St. Tr. 337. *Frier's Case*, Ib. 587, (1797.) *Callender's Case*, Ib. 710, (1800.) *Georgia* v.·*Brailsford et al.*, 3 Dal. 4. 2 Wilson's Lectures 372. *Commonwealth* v. *Knapp*, 10 Pick. 496. 13 Pick. 550. *Coffin* v. *Coffin*, 4 Mass. 25. *United States* v. *Wilson*, 1 Baldwin 108. *State* v. *Snow*, 6 Shep. 346. The English courts, during the struggle of their government to put down the freedom of the press, took the side of the government, and determined, that in prosecutions for a libel the jury could only decide as to the fact of the publication and the inuendoes, and the court would determine as to the intent, and whether libel, or not. But soon after the trial of the *Dean of St. Asaph*, 3 D. & E. 429, n, parliament interfered and passed an act, 32 Geo. III, declaratory of the right of the jury to pass upon the whole case, entitled an " Act to remove doubts relating to functions of jurors in cases of libel." This settled the question in England. The judges having disagreed in the case of *People* v. *Crosswell*, 3 Johns. Cas. 369, the legislature of New York, the same year, (1804,) passed an act making the jury judges of law and fact, *as in other criminal cases*. In this state the question was directly raised in *State* v. *Wilkinson*, 2 Vt. 480, and the opinion of the court fully expressed in favor of the rights of the jury.

The only cases, that can be found in the English courts, where any of the judges favored the doctrine now claimed by the prosecutor, are *King* v. *Lilburne*, 1 Harg. St. Tr. 69, 81, 82, 1 *Car.* II, in 1649; and the trial of *Algernon Sidney*, 3 Harg. St. Tr. 805, before Judge Jeffries. The former was before an extraordinary commission, eight years after the Star Chamber was abolished; but the jury returned a verdict of not guilty, and although examined before the council of state, nothing farther was done with them, or with

the case. The *dictum* of Ch. J. Best, in *Levi* v. *Milne*, 4 Bing. 195, [13 E. C. L. 396,] only applies to cases of libel. The first time the doctrine seems to have been favored by any American court was on the trial of *Battiste*, 2 Sumn. 243, in 1835,—where Judge Story charged the jury, that they must take the law of the case from the court; but he permitted the counsel to argue the law to the jury. The case of *The Commonwealth* v. *Porter*, 10 Met. 263, which is believed to be the only case, where the full bench have held this doctrine, presents the singular absurdity of deciding, that the defendant's counsel have a right to argue questions of law to the jury,—but the jury have no right to decide them. On the trial of Dorr for treason against the state of Rhode Island, Ch. J. Durfee told the jury, they must take the law from the court.

This doctrine expired in England, with Jefferies, in 1688; *it is of very recent origin here,* beginning only fourteen years back, confined to two states, Massachusetts and Rhode Island, and in the last probably wholly political; and opposed to it is the long and well settled practice of the English courts and bar, repeated decisions of the United States' courts from 1794, of the supreme court of the United States, the supreme courts of Massachusetts, New York, Maine and Vermont, the authority of eminent elementary writers, and the justice and propriety and security of the rule itself.

*W. W. Peck,* for respondent, insisted, that the prosecutor, having introduced evidence tending to prove three distinct sales of spirituous liquors, should not have been allowed to introduce evidence tending to prove other sales.

*I. Richardson,* for the prosecution.

The county court acted in its discretion, in admitting the evidence objected to; and the jury were not misled thereby.

The court very properly told the jury, what the duties of the court were, and for what the jury were held responsible. *United States* v. *Battiste,* 2 Sumn. 243. *Commonwealth* v. *Porter,* 10 Met. 263. *Commonwealth* v. *White et al.,* 10 Met. 14. Best, Ch. J., in *Levi* v. *Milne,* 13 E. C. L. 396.

The opinion of the court was delivered by

HALL, J. This is an indictment for dealing in the selling of distilled spirituous liquors without license, on which the respondent was found guilty in the county court, and the case is brought here by bill of exceptions.

The first objection made to the ruling of the court has been disposed of in favor of the verdict by our decision in the case of the *State* v. *Smith*, 22 Vt. 74, and I have nothing to say in regard to it. The other question is of much importance, and deserves serious and careful consideration.

The court, upon the request of the respondent's counsel to charge upon the point, charged the jury, in substance, that, in determining the case submitted to them, they were not the judges of the law, but of the facts only; and that they were bound to consider the law as laid down by the court to be the law of the case, and were bound to be governed by it in rendering their verdict. We are now to inquire into the propriety of the charge. It is not denied by those who would sustain the charge of the court, but that the jury, in all criminal trials, have the power to disregard the law, as laid down to them by the court, and to render a verdict of not guilty contrary to it. Nor is it pretended, that there is any power in the court, or any other tribunal, to set aside the verdict for any difference of opinion between the court and the jury in regard to the law, or in any manner to call the jury to account for rendering it. It is, however, insisted, that the jury are nevertheless legally bound to take the law of the case from the court, and that by departing from it they would both violate a principle of law, and be guilty of a moral wrong.

On the other hand, it is claimed that the power, which a jury may in such cases exercise, in rendering a general verdict, of determining the law and the facts of the case submitted to them, is a legitimate and legal power; a power which a jury, acting under their oath and governed by a sense of duty, may rightfully and properly exercise, although it be in contradiction to the law stated to them by the court.

It must, I think, be conceded, that the opinion of the legal profession in this state, from the first organization of the government— certainly until a very recent period—has been almost if not quite uniform in favor of the now controverted right of the jury. From

the earliest date, the supreme court, while they held jury trials in bank, were, as I have always understood, in the habit in criminal cases of charging juries, that they were rightfully the judges of the law as well as the facts; and I think the same has since been the general practice by the judges of the supreme court at *nisi prius.* The question in regard to the right of the jury was also incidentally before the supreme court in 1829, upon a charge of one of the judges at *nisi prius,* which it was contended, on the part of the respondent, was to be construed as having denied such right. It was conceded in the argument, that if the charge were liable to such construction, it could not be supported. The charge was held unobjectionable in that respect; but PRENTISS, J., in delivering the opinion of the court, remarks upon the question as follows:—" There is no doubt, the jury are judges of the law as well as the fact. This is the true principle of the common law, and it is peculiarly applicable to a free government, where it is unquestionably both wise and fit, that the people should retain in their own hands as much of the administration of justice as is consistent with the regular and orderly dispensation of it, and the security of persons and property. This power the people exercise in criminal cases, in the persons of jurors, selected from among themselves from time to time as occasion may require; and while the power thus retained by them furnishes the most effectual security against the possible exercise of arbitrary power by the judges, it affords the best protection to innocence." *State* v. *Wilkinson,* 2 Vt. 480. This opinion of a former chief justice of this state, of acknowledged legal ability and integrity, must be justly entitled to high consideration by this court.

The *right* as well as the *power* of juries in criminal trials to resolve both the law and the facts by their general verdict was also a favorite doctrine of the early jurists and statesmen throughout the United States, and continued such (as will be shown hereafter) until the contrary doctrine was broached by Mr. Justice STORY in 1835, in the case of the *United States* v. *Battiste,* 2 Sumn. 240. Since which time the lead of Judge STORY has been followed by the supreme court of Massachusetts in the case of the *Commonwealth* v. *Porter,* 10 Met. 263, and perhaps by judges and elementary writers in some of the other states.

It is, however, worthy of remark, that in both the opinions of

Judge STORY and of the supreme court of Massachusetts, the principal reason for the establishment and maintenance of this right of juries,—the preservation of the liberty of the citizen, and the protection of innocence against the consequences of the partiality and undue bias of judges in favor of the prosecution,—is *wholly overlooked.* Even in the labored opinion of Chief Justice SHAW, in *Porter's Case,* covering some twelve pages, it is not once even alluded to. The whole question is treated as resting on the comparative knowledge of judges and jurors in regard to the law, and in the supposed violation of the harmony of the legal system, which an admission of the right of jurors would occasion.

These matters are doubtless worthy of consideration; but that which has been disregarded appears to me to be of no less importance. Judge BLACKSTONE, in his Commentaries, (vol. iv, p. 349,) thus speaks of the trial by jury :—" The antiquity and excellence of this trial for the settling of civil property has before been explained at large. And it will hold much stronger in criminal cases ; since in times of difficulty and danger more is to be apprehended from the violence and partiality of judges, appointed by the crown, in suits between the king and subjects, than in disputes between one individual and another to settle the metes and boundaries of private property. Our law has therefore wisely placed this strong and twofold barrier, of a presentment and trial by jury, between the liberties of the people and the prerogative of the crown." Judge STORY, in his Commentaries on the Constitution, section 1773, says, the trial by jury " was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and religious liberties, and watched with an unceasing jealousy and solicitude." And the history of English criminal jurisprudence furnishes abundant evidence, not only of the necessity of such watchfulness, but also that the power of juries to determine the law as well as the facts in criminal trials was essential to the protection of innocence and the preservation of liberty. In trials for state offences, especially, the bias of the judges was always strongly in favor of the crown; and in most cases their partiality was such, that there was no security against the conviction of any person the government might accuse, but the independence and integrity of jurors. The question of the guilt or innocence of the accused being compounded of law

and fact, it was in the power of the court to shape the law to meet the proof; and if the jury would but submit to the direction of the judges in regard to the law, there was little or no chance for the escape of the prisoner, however weak the evidence might be.   Of this numerous examples might be given ; but they are too well known to the readers of English history to make it necessary to specify them.

It is this supposed independence of jurors in criminal cases, that has commended the English system of jury trial to the favor and eulogium of enlightened foreigners, and has procured its introduction into some of the more liberal governments on the Continent. The celebrated De Lolme, in his work on the Constitution of England, which he appears to have thoroughly studied, published in 1784, holds the following language :—" As the main object of the institution of the trial by jury is to guard the accused persons against all decisions whatsoever by men invested with any permanent official authority, it is not only a settled principle, that the opinion which the judge delivers has no weight, but such as the jury choose to give it, but their verdict must, besides, comprehend the whole matter in trial, and decide as well upon the fact, as upon the point of law that may arise out of it; in other words, they must pronounce both on the commission of a certain fact, and on the reason which makes such fact to be contrary to law." P. 175.   It is obvious, that the English system of jury trial would, in the estimation of this enlightened commentator, be shorn of its chief value, if the right of deciding upon the criminality of the fact proved were wrested from the jurors and transferred to the judges.

Without, at present, dwelling longer on the reasons why jurors ought to possess the right, in criminal trials, to resolve by their verdict both the law and the facts which are embraced by the issue, I proceed to inquire more directly into the actual state of the English and American law on the subject.

The origin and early history of juries is involved in some obscurity ; though I apprehend there is little doubt, that at their first institution, the whole matter in controversy between the litigant parties was heard and passed upon by their peers of the vicinity, without the observance of any practical distinction between the law and the facts of the case.   But when, by the progress of civilization, courts assumed a more regular form, and controversies became compli-

cated and difficult, questions of law, by the introduction of special pleading, were withdrawn from the jury, and placed upon the record for the determination of the court. If the pleadings ended in demurrer, an issue of law was formed for the decision of the judges; if they terminated in an issue to the country, it was to be resolved by the jury. So, also, any questions appearing upon the record on motion in arrest, or placed there by special verdict, or demurrer to evidence, or bill of exceptions under the statute of Westminster 2, c. xxxi., were to be adjudged by the court. The boundaries of the respective provinces of courts and juries, as well in civil as in criminal cases, were anciently marked and distinguished by the character of the questions, which were thus placed upon the record. Neither branch of the triers was allowed to invade the province of the other; and the right of the jury to determine the whole issue committed to them is believed to have been as perfect, as that of the judges to decide the issues that were referred to the court. The maxim, *"ad questionem facti non respondent judices, ad questionem legis non respondent juratores,"* had reference to the questions which appeared upon the record; and the ancient meaning of it was, that the questions of fact thus raised should not be answered by the judges, nor the questions of law by jurors. The doctrine, that questions of law, which might incidentally arise in the determination of an issue of fact, could be separated from the fact and left to the decision of the court, otherwise than by a demurrer to the evidence, or the finding of a special verdict, is of comparatively recent origin. It was unknown to the ancient common law, and has grown out of the modern practice of granting new trials for a difference of opinion between the court and jury upon questions of law arising on the trial, and is, doubtless, a legitimate consequence of the exercise of such power.

This power of granting new trials in civil actions, on the report of the judges of the proceedings at the trial, was first exercised by the court of Common Pleas about the middle of the seventeenth century; previous to which time it appears to have been well understood, that the jury were alone responsible for any error of law in their general verdict, and, consequently, had the right to determine it in conformity to their own judgment. Upon this point the historical evidence appears to be full and complete.

The first authority, to which I would refer in support of this position, is the statute of Westminster 2, c. 30, passed in the reign of Edward I, A. D., 1285. The statute is as follows, viz.: "The justices assigned to take assizes shall not compel the jurors to say precisely whether it be disseisin or not, so that they do show the truth of the deed, and require aid of the justices; but if they, of their own head, are willing to say that it is disseisin or not, their verdict shall be admitted at their own peril."*

The reason assigned by Lord Coke for the passage of this statute, as would naturally be inferred from its language, was, "that *some* justices did rule over the recognitors to give a precise verdict without finding the special matters;" by which they were compelled, whether they were willing or not, to take upon themselves the decision of the whole issue, and were thus made liable to an attaint for a false verdict upon any point of law involved in it, when they might desire to refer such point of law to the decision of the court. For their relief against this hardship, the statute provided, that they should not be compelled thus to decide the law against their will, but might, if they chose, find the facts by a special verdict, and thus place upon the record a question which should be answered by the judges. 2 Co. Inst. 422.

Lord Coke, in his commentary on this statute, says, that it was in affirmance of the common law, and "that in all actions, real, personal, and mixed, and upon all issues joined, general or special, the jury might find the special matter of fact, pertinent and tending only to the issue joined, and thereupon pray the action of the court for the law; and this the jurors might do at the common law, not only in cases between party and party, whereof this act putteth an example of the assize, but also in pleas of the crown at the king's suit." Ib. 425;—and to the same effect is *Dowman's case*, 9 Co. 12.

If it had been supposed, at the time of the passage of this act, that the directions of the judges, given on the trial, in regard to the

---

* The clause, as recited in 2 Co. Inst. 421, is in these words,—"Item ordinatum est, quod justiciarii ad assisas capiend' assignati non compellant juratores dicere præcise, si sit disseisina vel non, dammodo dicere voluerint veritatem facti, et petere auxilum justic'. Sed si sponte velint dicere, quod disseisina est, vel non, admittatur eorum veredictum sub suo periculo." And see Keb. St. 46.

law, were binding upon the jury, and that they would have been excused from the consequences of a false verdict by following such directions, there would have been no necessity for the enactment of the statute; for the jurors would have been entirely safe in their decisions, by taking care to comply with the directions of the court. But such compliance not being sufficient, it was necessary for the security of the jury to provide that they might, whenever they chose, put the question of law upon the record by a special verdict, to be afterwards answered by the court.

Littleton, who wrote two centuries after the statute of Westminster 2, recognizes the same right of jurors ·to determine the law involved in the issue tried by them by their general verdict, if they chose to do so, and points out the same relief from such responsibility, whenever they desired to shun it. In his Tenures, after speaking of the giving of a special verdict in an assize, he says, section 368, " In such case, where the inquest may give their verdict at large, *if they will take upon themselves the knowledge of the law, they may give their verdict generally, as is put in their charge;* as in the case aforesaid, they may well say, the lessor did not disseise the lessee, if they will."

This right of the jury to withhold a special verdict, and to pass upon the whole matter in issue, is also fully declared by Lord Coke, a century and a half after Littleton's time. In his commentary on the foregoing section of Littleton, Coke says, " Although the jury, if they will take upon them (as Littleton here saith) *the knowledge of the law,* may give a general verdict, yet it is dangerous for them to do so, *for, if they do mistake the law,* they run into the danger of an attaint; therefore, to find the special matter is the safest way, where the case is doubtful. *Co. Lit.* 228 *b.*

It seems evident from what has already been shown, that for a period of about 350 years, which preceded the publication of Lord Coke's Institutes in 1628, it was well understood, that the province of the judges did not extend to the determination of legal questions, which arose incidentally out of an issue of fact, but that for their proper decision the jury were alone responsible.

The power of courts to grant new trials in civil cases, for the reason that, in their opinion, the verdict of the jury was contrary to law, not having been recognized until since the days of Lord

XXIII.　　　4

Coke, there was not, previous to his time, any mode of relief against an erroneous verdict, except by the proceeding of attaint against the jury.  *Slade's Case,* Style 138.  *Wood* v. *Gunston,* Style 466.  By this process, brought by the party against whom the verdict was rendered, and to which the jurors were made parties, the case was, in effect, tried over again by a jury of twenty four, and if the verdict were found false, it was set aside and the jury punished. That this falsity might be found in the decision of the law as well as of the facts involved in their verdict is not only necessarily implied by the language of all the authorities before quoted, but is directly affirmed by others.  Thus, Chief Justice Hobart, in 1619, in *Needler's case,* (Hobart 227) says, " It will be hard to acquit a jury *that finds against the law,* either common or general statute law, whereof all men are to take notice, and whereupon verdict is to be given, whether any evidence be given to them or not.  As if a feoffment or devise were made to one *in perpetuum,* and the jury should find cross either an estate for life, or in fee simple, against the law, they should be subject to an attaint, though no man informed them what the law was in that case."  This is clearly to the point, that the jury were liable to an attaint for error in deciding the law involved in their general verdict.  Nor were they protected from an attaint by following the instructions of the judges in regard to the law, if the instructions turned out to be erroneous.  This is distinctly laid down by Chief Justice Vaughan in *Bushell's Case,* as follows :—" Finding against or following the direction of the court barely will not bar an attaint, but in some case the judge being demanded by and declaring to the jury what is the law, though he declare it erroneonsly and they find accordingly, this may excuse the jury from the forfeitures ; for though their verdict be false, yet it is not corrupt ; but the judgment is to be reversed, however, upon the attaint ; for a man loseth not his rights by the judge's mistake of the law."  Vaughan's R. 145.  So, also, if the jury disregarded the directions of the judge, they were not liable to an attaint if they determined the matter of law correctly.  *Paramore's Case,* Dyer 301.

But that questions of law involved in an issue of fact were not anciently treated as questions to be answered by the judges is farther shown by the fact, that bills of exceptions would not lie for mis-

direction of the judges to the jury in point of law, while the process of attaint continued in use, and for the very reason, that the jury were responsible for the correct decision of such points of law upon that process. This fully appears from the case of *Chichester* v. *Phillips*, in Sir Thomas Raymond's Reports, 404, decided in 1680. In that case, which was ejectment, the defendant having introduced a will duly proved in the Ecclesiastical Court, and insisted that the probate was conclusive proof of its execution, the court declined so to direct the jury, but left it to them to find the fact upon that and other evidence. The jury having found against the will, and a bill of exceptions being allowed, a writ of error was brought in the King's Bench, when the judgment below was affirmed,—not because the court had instructed the jury correctly, but, in the language of the reporter, " because, though the evidence be conclusive, yet the jury may hazard an attaint, if they will." See, also, 2 Jones 146, and Buller's N. P. 316.

There would then seem to be no doubt, that it was anciently admitted to be the proper province of the jury in civil cases, to decide in conformity to their own judgment all questions, whether of law or fact, which were embraced in the issue committed to their charge. And this result of the authorities necessarily disposes of the argument against the right of juries, drawn from the maxim, *ad questionem facti non respondent judices, ad questionem legis non respondent juratores*, inasmuch as it shows, that the maxim must have been understood to have reference alone to the questions, either of law or fact, as they stood upon the record.

The jurors, being anciently under no legal responsibility to the judges for the correctness of their decisions, either of the law or the facts of the case, might properly exercise their own discretion in their determination. But since motions for new trials and bills of exceptions have been substituted for the process of attaint, and courts have come to set aside verdicts, because the jury disregard the opinion of the judge upon questions of law embraced by the issue, and for misdirection of the judge, juries have been placed in a new relation to the judges. The court, by the modern practice, having power to revise the decisions of juries, and to order new trials for their neglect to follow the directions of the judge upon matters of law, it has consequently become their legal duty to com-

ply with such directions. And the court, and not the jury, may now be properly considered as the judges of the law involved in an issue of fact in civil cases, though it was formerly otherwise.

Having shown that it was the proper province of the jury, by the ancient common law, to determine, according to their own judgment, the whole issue committed to their charge in civil cases, it cannot well be contended, that their authority could be less extensive in criminal trials. Indeed, if the common law had originally limited the power of juries in civil suits to the decision of the facts, and had placed them under the direction of the court in regard to the law connected with the facts, it might still be claimed with entire confidence, that no such limitation had been imposed in prosecutions for crimes.

There are several important distinctions between civil actions and criminal prosecutions, which indicate very decisively, that whatever our English ancestors might have considered the power of judges over questions of law, embraced in the issue to the jury in the former, they must have contemplated their entire independence of the judges in the latter.

In the first place, there is a marked and important distinction between prosecutions for crimes and civil suits, in the authority by which they might be instituted. Any subject was at full liberty, at his own pleasure, to commence his action against a party, who he conceived had injured him in his person or property, and might freely prosecute his suit to final judgment and execution. But the king with the aid of all the judges in the realm, could not put an individual on trial for a capital offence, without first obtaining the consent of the people of the county assembled to pass upon the case as a grand jury. And if, previous to their investigation of the case the supposed offender had been arrested or committed to jail, their refusal to countenance the prosecution would at once release him from imprisonment. After providing so fully for the consent of the peers of the subject to the very institution of a criminal prosecution against him, it cannot well be conceived, that the jealous framers of the common law would have immediately withdrawn its protection from him and transferred the power of determining his guilt or innocence to the servants to the crown. It may be here remarked, that this restriction on the very commencement of a criminal prosecu-

State *v.* Croteau.

tion has been deemed so essential to the liberty of the citizen in this country, that a provision has been incorporated into the Constitution of the United States, and into the Constitutions of most of the individual states, " that no person shall be held to answer for a capital or otherwise infamous crime, but upon the presentment of a grand jury."

Again, the rules of pleading, which were anciently adopted, were designed to separate the law from the facts, wherever it was deemed practicable, for the purpose of submitting the former to the judgment of the court, and leaving the latter to the determination of the jury. In civil actions, if the defendant could not deny the facts on which the suit was founded, he was obliged to place his defence upon the record by special plea, which pleading usually ended in demurrer, forming an issue of law for the decision of the court. If the defendant in such case pleaded the general issue, the court would at once exclude his evidence, so that no power whatever was given to the jury to pass upon his defence. Under the ancient practice, in the old actions of debt, detinue, covenant, trespass and replevin, a large portion of the questions arising in litigated suits were thus withdrawn from the action of the jury and submitted to the determination of the judges. But in criminal prosecutions the accused was never compelled to take his defence from the jury and submit it to the court by special justification, but might always put himself on the country for his general deliverance.

It will be difficult, I think, to find a reason, why the rules of pleading, which were adopted in civil actions, were not extended to criminal prosecutions, unless it be in the design of the founders of the common law, that the right of passing upon the criminality of the fact, as well as upon the fact itself, involved in the general plea of not guilty, should, for the safety of the subject, be withheld from the judges, for the determination of the jury.

In the third place, the contrast between civil actions and prosecutions for crimes is most distinct and striking in the conclusive operation of the verdict in criminal cases. However the court may disapprove of a verdict of acquittal, they have no power, as in civil suits, to award a new trial. The security of the jury from all consequences in giving it is also full and complete. No earthly tribunal can revise their verdict, or call them to account for rendering it.

That, after a verdict of not guilty in a criminal proceeding, there exists no power to put the party again on trial for the same offence is a doctrine too well understood to require to be sustained by authorities. The jury are also exempt from all questions in regard to its propriety. The process of attaint, the remedy for a false verdict in civil cases, was never extended to verdicts in prosecutions for crimes. This, though there are some *dicta* to the contrary, was admitted to be the law by Lord MANSFIELD at the hearing of the Dean of St. Asaph's case, and is, indeed, established by authority beyond doubt or question. *Bushell's Case*, Vaughan's R. 146; *Trials per Pais*, 274; 1 Chit. Cr. Law 529, and cases there cited.

That attempts were made from time to time, and at various periods, by English judges, to encroach upon the rights of jurors to determine, in criminal proceedings, the whole issue committed to their charge, is undoubtedly true. The attempts were, however, resisted, and the contest, carried on by the judges on the one side and the people on the other, constitutes a part, and not an unimportant one, of the great struggle between the prerogative of the crown and the freedom of the subject, which was protracted for so long a period in England, and which eventually terminated in the practical triumph of the latter.

Some notice of the most prominent efforts of English judges to coerce and control the verdicts of jurors in criminal trials, and of the manner in which they were resisted, will, perhaps, serve to throw some light on the question involved in the present case.

The first attempts to compel jurors to give verdicts in conformity to the wishes of the judges were by fining and imprisoning them.

In 1554, Sir Nicholas Throckmorton was tried for high treason before a Court of High Commission, Bromley, chief justice of England, presiding, and found not guilty against the charge of the court. Before the jury separated, they were sent by the chief justice to prison, where they remained several months, when they were released upon the payment of enormous fines, by which most of them were ruined. State Trials, 901. In the despotic reign of Philip and Mary, there could be no redress for this arbitrary act of oppression.

In the time of Elizabeth, A. D. 1602, there appears to have been another instance of a jury being fined and imprisoned for giving a

verdict of not guilty, on an indictment of murder against the charge of the court, and, so far as any thing is known, the injury remained without redress.   Yelverton's R. 23.

During the succeeding reigns of the first James and Charles, the Court of Star Chamber, which consisted of privy councillors with two common law judges, was in active operation, and drew within its jurisdiction complaints for libels, and sedition, and all offences against the government which were not punishable capitally.   By the imposition of enormous fines and the infliction of barbarous and ignominious punishments, through the instrumentality of this court, the crown was generally enabled to disgrace and ruin whoever it chose to assail, without calling upon jurors in the common law courts to aid by their verdicts in bringing them to the block or the gallows.   But when that arbitrary and odious tribunal was, in 1641, abolished by the Long Parliament, it became necessary for the government to resort again to the ordinary tribunals for the punishment of crimes, either real or pretended.

The rights of jurors had by this time come to be pretty well understood, though they were not yet fully acknowledged by the ruling authority, whether it might be king or commonwealth.

In 1649, a few months after the execution of King Charles, Lieut. Colonel Lilburne was indicted for high treason against " the government by Parliament, without King or House of Lords;" and on his trial he argued to the jury, and read from Lord Coke's Institutes, to show that they were the judges of the law as well as the fact, and the jury acquitted him, against the charge of all the judges, who were clear for a conviction.   The Parliament, having failed to convict, passed a special act, banishing him by name, and declaring that his return to England should be deemed felony, for which he should, on conviction, suffer death.   He did return, and in 1653 was tried at the Old Bailey for felony, against the act by which he had been banished.   A copy of the act of Parliament, duly certified, was produced, and Lilburne, who was in court, was fully proved to be the person named in it.   The jury, however, against the charge of the court, held the act, under which he was prosecuted, to be illegal, and found him not guilty.   They were afterwards severally called before the council of state and questioned in regard to their verdict, and their answers indicate a decided and manly determination to

maintain their independence as jurors and freemen.  The answer of one of them, as entered on the minutes of the council, will serve as a specimen of the whole.  It is as follows :—" *Michael Rayner* being asked, whether Mr. Scobel, clerk of the house, did not give evidence that Lieut. Colonel John Lilburne, at the bar, was the very Lilburne against whom the act was made?  He said, he did give that evidence, and that he did believe he said true, and that the copy of the act of Parliament produced was a true copy."  But saith, " that he and the rest of the jury took themselves to be judges of matter of law as well as of matter of fact ; although he confessed that the bench did say they were only judges of the fact."  2 Hargrave's State Trials 79, 80.

In the reign of Charles the Second, Kelynge, Chief Justice of the King's Bench, a pliant instrument of the crown, fined Sir Henry Wyndham and eleven others of a grand jury, because they would not find a bill of indictment for murder, telling them that the man having died at the hand of the party, it was their duty to find the bill, it being matter of law for the court whether it was murder or in self defence.  He also fined a petit jury, who refused to convict a party on an indictment under the conventicle act, and the next year imposed a fine upon another jury, who declined to follow his directions upon a matter of law.  His own account of the latter case, as given in his reports, page 50, is as follows :—

" Hood was indicted for the murder of Newman, and upon the evidence it appeared that he killed him without any provocation, and thereupon I [Kelynge] directed the jury that it was murder, for the law in that case intended malice, and I told them they were the judges of the matter of fact, namely, whether Newman died by the hand of Hood ; but whether it was murder or manslaughter, that was matter of law, in which they were to observe the directions of the court.  But notwithstanding they would find it only manslaughter ; whereupon I took the verdict and fined the jury, of which John Goldwier was foreman, £5 apiece."

These illegal acts of the chief justice having (in December, 1667) been brought to the notice of Parliament, witnesses were examined, and he was heard in his defence, and the grand committee of justice reported to the House of Commons, that the proceedings of the Lord Chief Justice in these cases were " innovations in the trial of men

for their lives and liberties, and that he had used an *arbitrary and illegal power,* which was of dangerous consequence to the lives and liberties of the people of England." The committee also recommended that " the Lord Chief Justice be brought to trial, in order to condign punishment, in such manner as the house should judge most fit and requisite." But he having petitioned to be heard at the bar of the house, and there making an abject submission, the matter, by the intercession of his friends, was suffered to drop without being farther prosecuted.    6 State Trials 992, 1019.

Only one other attempt to control the decisions of jurors by punishing them for unsatisfactory verdicts, will be mentioned. In 1670, the famous William Penn, together with William Mead, were tried at the Old Bailey before a court of oyer and terminer, the Recorder of London presiding, for a breach of the peace, in being concerned in a tumultuous and unlawful assembly. The proof was, that some two or three hundred persons had peaceably and quietly met in Grace street, London, and listened to the preaching of Penn. Penn contended, that there had been no breach of the peace; that the assembly was lawful; and he read from Lord Coke to the jury in support of his position. The court charged strongly and bitterly against the prisoners; but the jury disregarded the charge and returned a verdict of not guilty. There were no disputed facts, and there can be no doubt the jury decided the law correctly. The court, however, were in great fury with the jury, and immediately fined them forty marks each, and committed them to Newgate. Edward Bushell, one of the jurors, with a similar resolution to that of John Hampden in regard to the ship money, refused to obtain his release by paying his fine, and brought his writ of habeas corpus to the Court of Common Pleas. It being returned upon the writ, that, being one of the jury, Bushell had acquitted Penn and Mead against evidence, and also " *contrary to the direction of the court in matter of law,*" the question of the power of the court to control their verdict upon the matter of law was distinctly raised. The case was argued before eleven of the twelve judges, and their judgment was delivered by Chief Justice Vaughan, denying any such power of control in the court, and vindicating the right of the jury to determine both the law and the fact by their general verdict; and Bushell was thereupon discharged. Vaughan's R. 135–158.

XXIII.        5

I am not aware, that the independence of juries, thus sanctioned by the judgment in *Bushell's Case,* has ever since been *practically* invaded, except in prosecutions for libel. Even in that class of prosecutions, the whole question of the guilt or innocence of the accused appears to have been submitted to the jury for a period of over fifty years after that decision. Among the instances in which this was done, was the trial of Thompson, in 1682; of the seven Bishops, in 1688, and of *Tutchin,* before Chief Justice Holt, in 1704. But, during the reign of George the Second, it began to be argued by some of the judges at *nisi prius,* that whenever the law could by any means be separated from the facts, in criminal trials, it should be determined by the court; that it could be thus separated in prosecutions for libels, because the libel was set forth in the information; and whether the matter charged to have been published was really libellous or not, was matter of law for the determination of the court. It was accordingly held, that the only questions to be submitted to the jury, were the fact of publication, and the truth of the inuendoes set forth in the information. Upon proof of these, the jury were required to render a verdict of guilty; leaving the question whether the publication was a crime or not for the subsequent decision of the court. 2 Starkie on Slander, chap. xvi.

This doctrine, which withdrew from the jury the whole question of the criminality of the publication, if it could have been firmly established, would have placed in the hands of the judges substantially the same power over political discussions, that had been so odiously exercised by the long suppressed Court of Star Chamber. It was adopted by Lord Mansfield soon after he took his seat on the King's Bench, and was followed by him in the trials of Woodfall and others; by Mr. Justice Buller in the Dean of St. Asaph's case; and on a motion for a new trial in the latter case, it was, in 1785, declared to be the law, by the unanimous decision of the King's Bench. *Rex* v. *Dean of St. Asaph,* 3 Term R. 429.

This doctrine of the King's Bench did not, however, meet the approbation of all the judges in Westminster Hall, and it was earnestly and vehemently opposed by most of the leading members of the profession, who, when employed for defendants, appealed from the judge to the jury in regard to their constitutional rights, and, in many instances, were successful in cases where, if the whole matter

State *v.* Croteau.

had been left to the jury, verdicts of guilty would probably have been obtained. This struggle against the alleged judicial invasion of the independence of juries continued from the time of Woodfall's trial, in 1770, till 1792, when the nation being thoroughly roused, the subject was taken up in Parliament, and Mr. Fox's famous libel act passed, by which trials for libels were placed upon a like footing with other criminal prosecutions. Parliament refused to recognize the decision of the King's Bench as ever having been the law of the land, the preamble of the act declaring, that "*whereas doubts have arisen*" as to the competency of jurors in prosecutions for libels "to give their verdict upon the whole matter in issue," therefore, it was enacted that the jury might give such verdict, &c.

This controversy in regard to the rights of jurors was the occasion of the well-known attack of Junius upon Lord Mansfield, which, so far as it imputed corrupt motives to that distinguished and venerated magistrate, was unquestionably unfounded and unjust. Lord Mansfield was, doubtless, sincere in the belief, that such a doctrine, which had been acted upon by other judges previous to his time, was essential to the preservation of order and good government against sedition and licentiousness. It is difficult, however, to free him from the suspicion of partiality of feeling in this matter. He appears to have been a member of the cabinet when the prosecutions for libels against Wilkes, and also that against Woodfall, which he afterwards tried, were resolved upon, though it cannot well be supposed he would have participated in the deliberations in regard to them. After he ceased to be a member of the cabinet council, he long exerted great influence with the ministry, and was relied upon by them to defend their measures in the House of Lords, which he often did with consummate skill and ability. Unless he is to be considered as exalted entirely above the common frailties of human nature, it is scarcely conceivable, that he could have been entirely impartial in prosecutions, instituted and maintained by an administration with which he was so intimately connected. He would seem, indeed, to have been one of that very class of judges, against the effects of whose bias in favor of the government the independence of jurors in matters of law, as well as of fact, was originally designed to guard.

It may be added, that, though the opinion of Lord Mansfield, in

State v. Croteau.

the Dean of St. Asaph's case, is ingenious and able, as is every thing that emanated from his powerful mind, yet it is nevertheless unsatisfactory. The intention with which the act is done must be an ingredient of every crime, and is, necessarily, a question of fact. By the rule adopted by the King's Bench, it is manifest, that the question of intent was withdrawn from the jury, and transferred to the court. To this extent, at least, the decision cannot be sustained by argument.*

The libel act eventually passed the House of Commons without a division, and met with but a feeble opposition in the House of Lords. It was advocated in both houses on the ground that juries, in criminal trials, had the constitutional right to pass upon the whole issue, the law as well as the facts, and that this right, having been improperly invaded, ought to be restored to its former footing. 29 Par. Hist. 577, 741, 1404. Mr. Worthington, in his treatise on the power of juries, although he endeavors to maintain the general authority of judges to direct them in matters of law, admits that in cases of libel, " The extraordinary right to decide the law has been, by the legislature, expressly committed to juries;" p. 196. Now, the language in which this right has thus been, as Mr. W. says, expressly committed to juries, is found in the first section of the act, and is simply, "That the jury sworn to try the issue may give a

---

* NOTE BY HALL, J.  One of the principal *authorities* relied upon by Lord Mansfield, in this case, was a ballad, stated to have been written by Mr. Pulteney, who was one of the supporters of the Craftsman, upon the occasion of the acquittal of the publisher of that paper by a jury, in a prosecution conducted by Sir Philip Yorke, Attorney General, about the year 1732.  The object of Lord Mansfield was to show, that even the opposition to the administration, at that time, of which Mr. Pulteney was the leader, concurred with the government, that the jury, in prosecutions for libel, had nothing to do with questions of law. The stanza from the ballad, as quoted by Lord Mansfield, was as follows :

> " Sir Philip well knows, that his inuendoes
> No longer will serve him in verse or in prose,
> For twelve honest men have decided the cause,
> Who are judges of facts, but not judges of laws."

It turns out, however, that Lord Mansfield's recollection of the ballad was erroneous, and that, as originally published, it was an authority on the other side of the question, the two last lines being :—

> " For twelve honest men have decided the cause,
> *Who are judges alike of the facts and the laws.*"

29 Par. Hist. 582.　5 Camp. Ld. Chan. 50.　6 Ib. 345.

State *v*. Croteau.

general verdict of guilty or not guilty upon the whole matter put in issue." It is, undoubtedly, true, that this does admit the right in the jury to decide the law as well as the fact involved in the issue; but it is precisely the same authority, that has always belonged to jurors in all other criminal trials, and has been exercised without question or objection ever since the judgment in *Bushell's Case*. How the permission given to the jury in the libel act to pass upon the whole matter in issue can confer the power to judge of the law embraced in it, and the same permission which has always been given by the common law can be construed to withhold it, is to me incomprehensible. I apprehend, the same authority to decide upon all matters in the issue exists in both cases.

In this country the decisions of judges and the opinions of jurists and statesmen have been, until a very recent period, quite uniform in favor of the independence of juries in criminal trials.

On the trial of Henfield, for illegal privateering, before Judges Wilson and Iredell, of the United States Supreme Court at Philadelphia, in 1793, Judge Wilson charged the jury, that they, in their general verdict, must decide both the law and the facts. Wharton's State Trials 88. Judge Wilson had, previously, in a course of law lectures, delivered in the College of Philadelphia, maintained by argument and authority this right of juries in all criminal trials. 2 Wilson's Works 366–375.

The Sedition Act of 1798 furnishes the very strongest evidence of the sense of the profession, as well as of the people of this country at that time, upon this question. That act prescribed a punishment for libels on the government of the United States and its officers, and after providing, that the accused might give the truth of the libel in evidence, declared, that " the jury who should try the cause should have *a right to determine the law and the fact, as in other cases ;* " the words, " as in other cases," being a direct reference to a right, the existence of which was understood to be sufficiently well known to form a general rule of action.

Judge CHASE, of the United States Supreme Court, on the trial of Fries for treason, in May, 1800, charged the jury, that " it was the duty of the court, in that and all criminal cases, to state to the jury their opinion of the law arising on the facts; but that the jury were to decide in that, and in all *criminal cases, both the law and*

*the facts,* on their consideration of the whole case." Chase's Trial, by Evans, Appx. 12, 45. This opinion of Judge Chase is entitled to the more weight, from his well known bias in favor of the government in state prosecutions, for the undue manifestation of which bias, on this very trial, he was afterwards impeached before the Senate.

On the trial of the impeachment, which took place in 1804, Mr. Tilghman, an eminent attorney of Pennsylvania, testified, on being inquired of, " that the usual practice in the courts in which he had been, was for the court to permit the counsel on both sides to argue the law to the jury at length," and after they finished, for the court to charge, and that " they generally informed them what, in the opinion of the court, was the law, *but that the jury were the judges of the law and the fact.*" Chase's Trial 27. And this right of the jury, though the question in regard to it did not directly arise on the trial of the impeachment, appears to have been generally understood by the managers and counsel to be the settled law. Ib. 101, 109, 182, 242, 247.

On the trial of William S. Smith, before the District Court of the United States, at New York, in 1806, for being concerned in a military enterprise against the Spanish American provinces, Judge TALMADGE charged the jury, that it was a well settled rule of law, that the right appertained to them to decide the law as well as the facts, in criminal prosecutions, " but that the jury were not, therefore, above the law ; and that, in executing the right, they attached to themselves the character of judges, and as such, were as much bound by the rules of legal decision as those who presided over the bench." Trial of Smith and Ogden 236.

On the trial of Wilson and Porter, in 1830, for robbing the mail, Judge BALDWIN, of the Supreme Court of the United States, after stating to the jury what he conceived the law applicable to the case to be, addressed them as follows :—" We have stated to you the law of this case, under the solemn duties and obligations imposed on us, under the clear conviction that in doing so we have presented to you the true test, by which you will apply the evidence to the case; but you will distinctly understand, that you are the judges both of the law and the fact in a criminal case, and are not bound by the opinion of the court; you may judge for yourselves, and if you

should feel it your duty to differ from us, you must find your verdict accordingly." Baldwin's R. 99.

In the state of New York, in 1804, in the case of *The People v. Crosswell*, for a libel on President Jefferson, the Supreme Court was equally divided upon the question, whether the intent of the respondent in making the publication ought to have been submitted to the jury ; Judges Lewis and Livingston holding to the doctrine of Lord Mansfield, in the Dean of St. Asaph's case, and Judges Kent and Thompson being of opinion, that the whole issue was for the jury. The attention of the legislature of the state being thus called to the subject, an act was passed in 1805, which, after reciting that doubts had arisen whether, in prosecutions for libel, the jury had a right to give their verdict on the whole matter in issue, declares, that—" in any such indictment or information, the jury who shall try the same shall have a *right to determine the law and the fact,* under the direction of the court, in like manner *as in other criminal cases;*" thus, equally as in the case of the Sedition Act, furnishing most conclusive evidence, that the general right of juries to judge of both law and facts was understood to be settled and established.

So important was the independence of juries in trials for libels deemed to be, that the provisions of the act of 1805 were substantially incorporated into the amended Constitution of the state in 1821 ; and similar provisions, implying the existence of the right of the jury to determine the law and the facts, in all criminal trials, will be found in the constitutions of many, probably of a majority, of the states of the Union. Indeed, the opposition to this generally approved doctrine seems to have been so isolated and inconsiderable in this country, as scarcely to have attracted attention, until it was brought into notice by Judge Story, in 1835, in the case of Battiste, before mentioned. The following state authorities are also in favor of the now controverted rights of juries :—*State* v. *Snow,* 6 Shep. 436; 2 Swift's Dig. 174; 1 Wheeler's Crim. Rec. 108, 269; *Ross* v. *Commonwealth,* 1 Grattan 557 ; *State* v. *Allen,* 1 McCord 525; *Holden* v. *State,* 5 Georgia R. 441; 5 Ala. R. 666; *State* v. *Armstrong,* 4 Blackf. 247, overruling *State* v. *Townshend,* 2 Blackf. 151, and 2 English R. 59.

In Massachusetts, as well as in the other states, the early doctrine appears to have been favorable to the independence of juries in all

State *v.* Croteau.

criminal trials; and so late as 1830, in the trial of Knapp for murder, the Supreme Court of that state, sitting in bank, acknowledged and declared the right of the jury to determine the law as well as the facts by their general verdict; and in 1837, in the case of the *Commonwealth* v. *Kneeland,* the same doctrine seems to be admitted. 10 Pick. 497; 20 Pick. 222.   But in the case of *Commonwealth* v. *Porter,* decided by the Supreme Court in 1845, (10 Metc. 263,) the previous cases on that subject were disregarded, and the right of the jury to differ from the court, in relation to the law, in making up their verdict, is denied.   The court, however, seem to shrink from the consequences of their decision; for it is a singular feature of the case, that although the court held, that the jury must be absolutely governed by the law as laid down by the court, yet the verdict was, nevertheless, set aside, because the judge who tried the case refused to allow the counsel for the accused to argue the law to the jury.   It would, therefore, now seem to be the law of Massachusetts, that it is an acknowledged right of the respondent's counsel to read his authorities, and argue the law fully to the jury; yet that, if the jury pay the slightest regard to the authorities or argument, they violate a settled principle of law, and are perhaps guilty of official perjury.   I cannot but think that upon one or the other of these points, the Supreme Court of Massachusetts must be in error.

The right of juries is also either qualified or denied in *Montgomery* v. *State,* 11 Ohio R. 427; *Pierce* v. *State,* 13 N. H. 536; *Montee* v. *Commonwealth,* 3 J. J. Marsh. 149; and *State* v. *Townshend,* 2 Black. 151, since overruled as before stated.

I will now proceed to notice some objections that have been made to the doctrine maintained in this opinion.

The opinion of Chief Justice Best, in *Levi* v. *Milne,* 4 Bing. 195, was relied upon by the counsel for the state, to show that even in England the libel act has not been considered as conferring authority on the jury to determine the law involved in the issue of not guilty. Such appears to have been the language of that judge, not only in that case, but in the previous case of *Rix* v. *Burdett,* 4 B. & Ald. 95.   [6 E. C. L. 358.]   But in *Rix* v. *Burdett,* Chief Justice Abbott differed with him, and declared as his opinion, "that the jury were at liberty to exercise their own judgments upon the whole matter in issue, after receiving the opinion and declaration of the judge."

Since the case of *Levi* v. *Milne*, the subject has undergone considerable discussion in England; and it appears now to be settled, against the opinion of Chief Justice Best, that the whole matter of the issue is for the jury. It is now held, that the judge is not bound to give his opinion to the jury, whether the publication be a libel or not, and that the whole question of libel or no libel is for their determination. *Fairman* v. *Ives*, 5 B. & Ald. 642; [7. E. C. L. 223.] *Baylis* v. *Lawrence*, 11 Ad. & El. 920; [39 E. C. L. 270.]

Mr. Worthington, in his work on the power of juries, refers to a few ancient authorities in support of the idea of there having formerly been a controlling power in the judges over the points of law embraced in the issue to the jury; none of which will, however, on examination, be found to sustain that position. Thus, he says, "it is most unequivocally declared by Glanville, that the assize could not decide upon the law connected with disseisin." And hence he would have it understood, that the statute of Westminster 2 did not mean, as its language imports, that the jury might decide upon the question of disseisin by their general verdict. But the case put in Glanville, *lib.* 2, c. 6, by Mr. Worthington's own showing, was one in which the pleadings, which were then *ore tenus*, ended in an issue of law, and because it had thus become an issue of law on the record, the trial was withdrawn from the assize and transferred to the court. Worthington 118.

He also relies upon three cases in Plowden's Reports, viz., *Townshend's Case*, p. 111; *Willion* v. *Berkley*, p. 223; and *Grendon* v. *Bishop of Lincoln*, p. 493. In the first case the jury found a special verdict, stating the facts at large, and then added their own conclusion in regard to the law. The very object of a special verdict being to submit the question of law to the court, it was very properly held, that the jury had exceeded their authority, and the court adopted their own conclusion upon the facts found. In the next case, one of the parties, in order to get his case to a jury, undertook to traverse a matter of law; but the court, in the language of Plowden, held, "that if the parties are agreed upon the matter of fact, they shall not traverse the law thereupon, as to say, the law upon this matter is with me, *without that*, that it is with you; but the judges shall adjudge upon it without traverse of the party." And the third case is to the same effect, that a party could not traverse

XXIII.        6

State *v*. Croteau.

matter of law, because that was to be decided by the court. Worthington 119–124. In these several cases, the province of the court to determine questions of law is very properly insisted on; but in none of them is there any intimation, that the court could determine any question of law, which arose out of the issue on a jury trial. Indeed, the most thorough research in favor of the restricted right of juries has not brought to light a single ancient authority, which countenances the existence of such a power in the court, even in civil cases, while the remedy for a false verdict by attaint was in use; nor a single authority which contravenes in the slightest degree the doctrine laid down by the plain language of the statute of Westminster 2, of Littleton, and of Coke, that the jury, by a general verdict, decide upon the law as well as the fact included in the issue. While, on the other hand, the doctrine of the statute, sanctioned by those venerated expounders of the ancient law, has been shown to be in accordance with cotemporaneous decisions and practice. It may not be wholly out of place to add, that this view of the right of jurors is sustained by the learned Mr. Hargrave, in his commentary upon the maxim *ad questionem* in Coke's Institutes, and also by Mr. Chitty in his approved treatise on criminal law. Co. Litt. 155, note 276; 1 Chitty's Cr. L. 637.

It has been claimed, that the allowance of bills of exceptions in criminal cases is inconsistent with a right of the jury to pass upon the whole matter in the issue tried by them. It is, doubtless, true, that the doctrine of bills of exceptions proceeds upon the presumption, that the directions of the judge in matters of law are followed by the jury to the extent to which such directions are made subject to the revision of the court; and to that extent the law involved in such issue may be conceded to be under the control of the court. But the limited extent, to which the remedy may be applied, furnishes an argument in favor of, rather than against, the controverted right of juries.

Bills of exceptions were unknown to the common law, and in England were authorized by the statute of Westminster 2, c. 31, which has been uniformly held to apply only to civil suits. Neither in England, nor in the federal courts of the United States, was there ever any remedy by bill of exceptions in criminal cases. 1 Chit. Cr. Law 622; *United States* v. *Gilbert*, 2 Sumn. 104. The remedy,

wherever it exists, is founded on the local statutes of the several states. In this state, the accused party, in case a verdict of guilty is returned against him, may file 'exceptions to any decision or ruling of the judge upon the trial, and carry the matter of law to the Supreme Court. But no provision is made for exceptions in behalf of the state, and a verdict of acquittal is beyond their reach.

It is most obvious, that this remedy does not deprive the accused of any privileges, which he had before enjoyed, but was designed to furnish him with a new and additional security against the danger of an illegal conviction. To the protection which the common law had provided, that before the accused should be subjected to punishment for a crime, there should be a verdict of his equals, that in fact and in law he had been guilty of it, the statute superadded the farther security, that the decision of the jury against him should not have been induced by such action or advice of the court, as, in the opinion of the superior tribunal, was contrary to law. The effect of the remedy is, not to deprive the jury of the right, in favor of the prisoner, of determining the law, but to render a concurrence in opinion of both the court and the jury, in regard to the law, necessary to his conviction and punishment.

The modern practice in England of granting new trials in cases of misdemeanors, where, in the opinion of the judges, the verdict is against law, produces the same effect as our bills of exceptions. A new trial is never granted on application of the crown, but only on that of the prisoner, after a verdict of guilty. It furnishes the accused with an additional shield for his defence, but takes from him no previous right. Both bills of exceptions and new trials are similar in their operation to a motion in arrest of judgment. They are all applied after a verdict of guilty by the jury, and all operate as additional securities against his illegal and improper punishment.

When the legislature of a state shall become bold enough to provide by law, that exceptions may be filed in behalf of the prosecution and a verdict of acquittal set aside and a second trial awarded, for the reason that the jury disregarded the instructions of the judge upon the matter of law, then, and not till then, can an argument be raised from the law of exceptions against the right of juries in favor of the prisoner to determine both the law and the fact involved in the issue.

State *v.* Croteau.

The alleged unfitness of jurors to decide questions of law has been urged as an argument against their legal right to make such decisions; and though the argument must necessarily be inconclusive, it may, nevertheless, be proper to notice it. It is undoubtedly true, that judges are presumed to be possessed of legal learning greatly superior to that of jurors, and in that respect to be much more competent to decide legal questions. It is to be noticed, however, that the question involved in an issue of not guilty of a crime are seldom, if ever, of a complicated or difficult character. They relate to the sufficiency of the evidence to constitute the crime charged in the indictment;—as whether the proof is sufficient to show that the party accused has committed the crime of murder, of manslaughter, of theft, of perjury, of arson, &c.; which questions, with the aid of the arguments of opposing counsel, a jury, even without the advice of the court, would ordinarily have little difficulty in determining rightly. But experience proves, that juries habitually show a respectful deference to the advice of judges upon points of law arising on a trial, and that the examples of their resisting such advice are not of common occurrence. And when such instances happen, they are not always from the fault of the jury. Indeed, if a judge conducts a trial in a fair and impartial manner, and, paying a just regard to the rights of the jury, advises them intelligibly and correctly upon the matter of law, he will seldom find occasion to complain of their disregarding his counsel.

But freedom from partiality and undue bias is essential to the just decision of legal questions, as well as law learning; and though jurors might, from want of legal information, sometimes improperly acquit a guilty party, yet such acquittal would be a much less evil than the conviction by a partial judge of one who was innocent. The decisions of successive juries are not likely to be wrong, except in occasional instances; while one decision of a court, forming a precedent for another, would, if erroneous, produce a continuance in error. In this respect, the danger in criminal prosecutions would be greater from trusting too much to the judge than to the jury. The objection to the fitness of jurors to decide questions of law was as forcibly stated by Lord Mansfield in the Dean of St. Asaph's case, as it has been since, or perhaps ever can be. His argument, however, failed to convince the nation of the correctness of his de-

cision, excluding the law of libel from the consideration of the jury. ·
The nation, by their representatives, gave full evidence, that they
preferred the security furnished to the liberty of the subject by the
right of the jury to judge of the law in each individual case—imper-
fect as their judgment might be—to the dangerous uniformity and
harmony of successive convictions, registered by order of the judges.

Notwithstanding the extended consideration, which I have deemed
it proper to give the question of the right of juries to determine the
whole issue in criminal prosecutions, I think the right may be suc-
cessfully maintained on much narrower grounds.

The *power* of juries to decide the law as well as the fact involved
in the issue of not guilty, and without legal responsibility to any
other tribunal for their decision, is universally conceded. *In my
opinion, such power is equivalent to right.*

Lord Mansfield, perceiving the want of all power to control the de-
cision of the jury, admits, in the Dean of St. Asaph's case, that the
distinctive province of the court over the law involved in an issue to
the country can only be preserved by the honesty of the jury; and
Mr. Justice Ashurst compares the power of the jury to pass upon the
law in such case to that of a man with a pistol at your head, who has
the power to take away your life, though not the right. That there
is a distinction ·in morals between power and right is undoubtedly
true, and such distinction may not be inaptly illustrated in the case
supposed. But this distinction has no application to questions of
political power. Where the political power which rests in a state is
distributed by the constitution or laws among the different officers
or departments of the government, the very distribution or assign-
ment of the power implies, that it may be lawfully and rightfully
exercised. Indeed, the very object of conferring the power is, that
it may be thus exercised.

The king, by the unwritten constitution of England, has the sole
power of declaring war. This power, though not founded on any
statute, has existed for ages; and though sometimes complained of,
has never been declared illegal. It will not be denied, that this
power in the king is a legal right; and yet the only evidence, that it ·
is so, is to be found in the continued existence of the power, with-
out authority in any other branch of the government to interfere
with its exercise. The power of the jury is of the same character.

Why should the right accompany the power in the one case and not in the other? The reason given, why the power of the jury cannot be considered as a right, is their unfitness for its proper exercise. This, however, is matter of opinion. The unfitness of the king for the exercise of the war power might appear equally strong to many minds, and might be urged with much force against the propriety of his being allowed to exert it. I apprehend Lord Mansfield would not have listened very patiently to such an argument against the constitutional right of the king to declare war; and yet, it is the very argument by which he would convert the exercise of a power of the jury, which has existed from time immemorial, into a wrong. In both cases, the argument, from unfitness, rests on assumptions, which, if they were true, might furnish good reasons for withdrawing the power altogether; but the fact, that the power has been suffered to continue for ages without having been withdrawn, ought to be conclusive evidence, that it was allowed to remain for the purpose of being exercised.

If the power of determining the whole issue in a criminal prosecution, upon a plea of not guilty, had been expressly conferred on the jury by statute, and the court, by the same statute, had been prohibited from questioning in any manner the propriety of the verdict, it would scarcely be pretended, that the statute did not confer on them the right as well as the power. Such we have already seen is the admitted effect of the English libel act. And is not the power equally a right, which has to the same extent been exercised for centuries by the authority of the common law, and which power, though sometimes questioned, has always been vindicated and maintained?

This power of a jury is doubtless liable to abuse; and so is the power conferred on a court, or on any other human tribunal. But while a jury or court keep within their proper sphere of jurisdiction, they are in the exercise of the powers conferred on them, and are in the performance of a legal right; and this though they may, by the abuse of the power, be guilty of a moral wrong. The extent of the jurisdiction of a court or jury is measured by what they may or may not decide with legal effect, and not by the correctness or error of their decision. Thus the butcher Jeffreys, by virtue of his office as judge, had the political power, and consequently the legal right, to conduct the trial of Algernon Sidney, and to give his opinion upon

State *v.* Croteau.

the law of the case in his charge to the jury, though for his shameful abuse of the right he may have incured the deepest moral guilt. So the jury, in a criminal trial, have the legal right to decide the law as well as the fact involved in the issue; but this does not give them a right, by a wanton disregard of law, to decide arbitrarily. They are as much bound to exercise their best judgment and discretion in determining the law, as a court is; and they are held by an equally strong obligation to do so. The oath which is administered to them, " that they will truly try and true deliverence make between the state and the prisoner at the bar, according to the evidence given them in court, *and the laws of the state,*" embraces the whole matter in issue, and binds them equally with the judges to perform their duty faithfully and conscientiously.

I conclude, then, that when political power is conferred on a tribunal without restriction or control, it may be lawfully exerted; that the power of a jury in criminal cases to determine the whole matter in issue committed to their charge, is such a power, and may therefore be lawfully and rightfully exercised; in short, that such a power is equivalent to, or rather is itself, a legal right.

I am aware, that the causes, which in England rendered the establishment of this right of juries indispensable to individual safety, if they now exist in this country, must be conceded to operate with comparatively slight force. It may be, that there is not in this state, at present, any undue bias in the court in favor of the government, in criminal prosecutions. But of this, it does not perhaps, become the judges to speak. It may be, that there is no just cause for the apprehension of such an evil in future. If, however, it be wise and expedient to declare, that there shall no longer be any check to the possible exercise of this undue bias by the judges, it should be done by legislative determination, not judicial decision. If the legislature desire, that juries should hereafter take the law in criminal trials from the court, they can readily say so, and prescribe a mode for carrying their will into effect. Until they do so, I shall be disposed to abide by the law as it has come down to us from our ancestors.

There being error in the charge of the county court to the jury, the verdict is set aside, and a new trial granted.

BENNETT, J., dissenting.

The question mainly discussed in this case is important; and as I do not concur in the opinion expressed, I shall state somewhat at length the grounds of my dissent.

But before I proceed to the main question, I would observe, that let that be disposed of as it may, it appears to me to be an anomaly in judicial proceeding, to reverse the judgment of the court below, on this bill of exceptions. The court, it appears, charged the jury correctly *as to the law of the case,* and to the satisfaction of the respondent; but the complaint is, that, after this, the court told the jury, in substance, that they must take the law of the case from the court, and that the jury were only to determine the facts. *The case itself* was, then, correctly tried, and the conviction *legal,*—it being had under a charge *satisfactory* to the respondent, as to the merits of this particular case. Why, then, should this court open the case for a new trial, unless it be to give the respondent an opportunity to have another jury acquit him *contrary to law?* The charge of the court, that they were the judges of the law, and not the jury, may well be considered, in this case, as *theoretical;* and if wrong, no injury was done to the respondent.

Upon a second trial, the court, as to the law of the case, would be bound to give the jury the same instruction, perhaps I should say *advice,* and the jury should follow it, if sound, notwithstanding it be held, that they are the paramount judges of the law; for no one will contend, I think, that the jury have the right to disregard the law; and if they did, it would in effect be a *mis-trial,* and an acquittal against law. If this court open the case, it should be, I conceive, for an injury done to the respondent himself, and not because it may be thought the court below advanced an untenable opinion, as to who were the ultimate judges of the law. This case was not brought up, I take it, for the purpose of redressing any wrong done to the jury, by the court having invaded their province. The respondent is the only party complainant on the record, and the question is, has he been injured from any thing which appears upon the record, though it be granted, that the instruction given to the court below should have been simply *as advice?* If a judge in a civil case should give a jury wrong instructions as to the law, and the jury should find contrary thereto, and it should appear, upon the hearing

for a new trial, that the judge was wrong and the jury right, the court will not grant a new trial, for the reason, that it would be putting the parties *to trouble* and *expense, to no good purpose.* This is settled law.

Though we treat proceedings upon bills of exceptions as proceedings in error, yet the court will look at the whole record; and if upon the whole record they can see, that the judgment was right, they will not reverse it, though some error may have intervened on the trial. See *Wood* v. *Scott*, 13 Vt. 49, and *Morse* v. *Crawford*, 17 Vt. 499. To hold otherwise would be useless trifling. In the case at bar, the whole record shows, that the conviction was right,—the respondent being satisfied with *the law of the case*, as given to the jury.

I apprehend, that it will not be contended, that there can be any well grounded distinction, in this respect, between civil and criminal cases; and I am quite at a loss for reasons, which should induce me to reverse the judgment below, though I were to concede the question, that the jury in criminal cases are the paramount judges of the law.

But the important question argued and decided in this case, though as I think unnecessarily, for the reasons given, is this,—is the *duty* of passing *definitively* upon the law, in a criminal case, imposed upon the jury, or does it rest upon our courts?

When we speak of the *right* of the court, or of the jury, to pass upon the law in a criminal case, there is evidently an inaccuracy in the use of language. So far as the public, or the accused, is concerned, it becomes a *duty* upon the one or the other of these tribunals to decide the law; and it is equally the *right* of the public, and of the *accused*, to demand a performance of *this duty* from that organ in the administration of justice, where the *duty* is constitutionally and by the laws of the land imposed; and the performance of this duty is *imperative* and cannot be cast off, at pleasure. If the jury are the paramount judges of the law, the *government*, as well as the *accused*, must have the right to call for a discharge of this duty, unless we run into the seeming absurdity, that the jury are the judges of the law for the *accused only*. When we speak of the performance of this duty, in relation to the court, or jury, it may properly enough be said to be a right in the one, or the other, dependent upon and growing out of their duty.

XXIII.     7

State *v.* Croteau.

I shall attempt to maintain, in the first place, that, upon authority, and the true principles of the common law, it was not a *duty imposed* upon the jury to overrule the court upon a criminal trial, upon questions of law, though they might differ from them, but that they ought and are bound to apply the law, as they have it in charge from the court, to the facts of the case, as found by them,—though it may be and is true, that if they *acquit* against the charge of the court, their *acquittal is final.*  And in the second place, if there is a different doctrine established in England, and it is the duty, and, if you please, the right of the jury to decide both law and fact, in their general verdict, yet the reasons, which led to the claim of such a doctrine in England, have no place with us, and the genius of our government and the fitness of things should lead to a different result.

Before we proceed to an examination of principles and authorities, it may be remarked, that, if it can be sustained, that the jury are the *paramount* judges of the law, it is only for one purpose, and that is *an acquittal.*  The *duty* is not imposed upon them, to place themselves in an antagonistic position with the court, for the purpose of *conviction,*—and indeed they cannot,—but only for *acquittal.*  I am not one of those, who are disposed to underrate the value of a jury trial, whether in civil or criminal cases; and I fully concur with Blackstone when he remarks, in his Commentaries, with great propriety, that the laws of England have placed a two-fold barrier between the liberties of the people and the prerogative of the crown, viz., presentment, and trial by jury; but he does not intimate, that, to sustain this barrier in a proper manner, they must be in any sense judges of the law.  Judge Story, in his Commentaries on the United States' Constitution, says, " the trial by jury was insisted upon by our ancestors, as the great bulwark of their civil and religious liberty;" yet he has maintained, in the most pointed manner, that the jury are not judges of the law.  If, in times of difficulty and danger in the English history, there was reason to contend for the doctrine, that jurors were judges of the law, as well as the facts, as being necessary for individual safety, it must have arisen in times of high excitement, from the supposed or actual violence and partiality of judges appointed by the crown, in cases where the crown was a party, and not out of the supposed fitness of things; and if so, should

a principle, unfit in the nature of things, and which arose under another government, and out of an abuse in the administration of justice, be retained after the cause, which originated it, has passed away? And more especially should it find a lodging place in this country?

I would premise, before entering upon the authorities, that in prosecutions for libels much angry discussion arose, as is well known, in regard to *the intent* with which the publication was made, as well as its *tendency.* While it was claimed, on the one side, that a *criminal intent,* flowing from an unlawful act performed without any legitimate excuse, was an *inference of law,* on the other hand it was claimed with equal confidence, that in all cases the *particular intent,* with which a publication was made, was as much a matter of fact, as the publication itself, and equally for the jury. The merits of this question are not now for examination. All I wish to say is, that those libel cases, where it has been submitted to the jury to find the *intent,* with which the publication was made, and its *tendency,* upon the ground, that they were an *inference of fact,* or a *mixed* question of law and fact, are not authorities to support the present decision of this court. I would also premise, that what may have been claimed by counsel, however eminent, in their captivating harangues to a jury, in exciting criminal trials, in regard to their being the *paramount* judges of the law, can have but little effect, in showing what the law truly was. The same may be said of pamphlets, and partizan essays, published in the heat of party excitement. And though there may be cases, where the jury, as in the trial of Colonel Lilburne, "took themselves to be judges of matter of law, as well as matter of fact," in opposition to the direction of the court, yet this cannot be regarded as any evidence of what the law was. It only shows, that such a doctrine was contended for,—not that it was a principle of the common law. Blackstone tells us, " that the decisions of courts of justice are the evidence of what is common law; and that these are handed out to public view in the numerous volumes of reports." Let us then see what evidence is to be had, from this source, as to the true state of the law on this much litigated question.

In 1554, on the trial of Sir Nicholas Throckmorton for high treason, the jury were charged, in effect, by Bromley, Chief Justice,

that they should take the law from the court; and the jury were even punished for disregarding their instructions.   State Trials 901.   In *Wharton's case*, (in 1602,) Yelv. 24, the jury were fined for their verdict, and *finding against direction*.   That was an indictment for murder ; and the jury would convict only of manslaughter.   This case shows, that the court then supposed the law to be, that the jury were bound *by direction*.   Ch. J. POPHAM was then one of the judges.   In 1649 John Lilburne was tried for treason; and when it was claimed, that the jury were the judges of the law as well as of the facts, Ch. J. KEBLE replied, " I tell you, in the opinion of the court the jury are not the judges of the law."   Justice JERMIN, in his remarks, adds, *" the jury ought to take notice of it, that the judges, who are twelve in number, and who are sworn, have ever been the judges of the law, from the first time that we can ever read or hear that the law was truly expressed in England, and the jury only judges of matter of fact."*   2 Harg. State Tr. 19, 70.   Though this was a trial, conducted with considerable warmth, and it is said high words passed, (the accused evidently being very contumacious in his manner,) yet this should not destroy the effect of the testimony of the judges, how they considered the law ; and we cannot suppose them to be ignorant of the juridical history of the times in which they lived.

In 1670, on the trial of Penn and Mead in the King's court of *Oyer and Terminer*, which was held for the city of London, the court claimed to be judges of the law, and in fact proceeded to punish the jury, because they gave a verdict against their directions. See 3 Co. Litt., Harg. Notes, 155, n. 276.   *Bushell's case*, Vaughn's R. 135.

In 1678 we have Hood's case, who was indicted for murder.   The killing was proved, without there being any provocation, and Ch. J. KELYNGE charged the jury, " that this was murder, the law implying malice, and that this was matter of law, and that the jury were to observe the direction of the court, and that they only were judges of the facts ; " yet the jury would convict only of manslaughter. Kelynge 50.   Though it has been said, that Kelynge was but a pliant instrument of the crown, yet the law of that case has continued to be the law of England to the present day.

In 1683, on the trial of Algernon Sidney, 3 Harg. State Trials,

818–19, the Lord Ch. J. charged the jury, that the court were bound to *declare* the law to the jury, and that they *were bound* to receive *their declaration* of it. Justice Withins, added, " we concur with my Lord, the Chief Justice." Though that trial was in troublesome times in the English history, and the Chief Justice a violent partisan in cases where the crown was concerned, yet it still furnishes evidence, how the law was then understood in this one respect. In 1702 we have *Fuller's case,* before Chief Justice Holt, 5 Harg. State Trials 443. The charge of the Chief Justice excludes the idea, that the jury were judges of the law. He tells the jury, " You hear the witness say, that he (Fuller) brought the two scandalous books to the press, and that he corrected them, and he owns he was the publisher, and if *you believe he did so, you are to find him guilty.*"

Tutchins' case, in 1704, was also tried before Lord Holt ; 5 Harg. State Tr. 542. In summing up to the jury, Ch. J. Holt uses this language, " you are to consider, whether you are satisfied, that Mr. Tutchin is guilty of writing, composing and publishing these libels ;" and he closes by saying to the jury, " if you are satisfied, that he composed and published *these papers, you are to find him guilty.*" This necessarily assumes, that the *intent,* with which the publication was made, as well as whether the papers were *libellous,* were matters of law for the court. It has been claimed, that in this case the whole matter was submitted to the jury. It is true, Lord Holt, in one paragraph of the charge, told the jury, " they are to consider, whether the words did not tend to beget an ill opinion of the Government." But it will be seen by a report of the case, that the counsel had been permitted to argue to the jury, that the papers in question were not *libellous* upon the Government, and in fact that nothing was a libel, which did not reflect upon some particular person ; and the Chief Justice, after showing to the jury the absurdity of the position of the counsel, follows with the remark to the jury, that they will consider the tendency of the words, &c. It is said by Lord Mansfield, in the case of the Dean of St. Asaph, that judges have sometimes expatiated to the jury upon the enormity of the libel, to remove the prejudices of the jury, and to obviate the captivating harangues of the defendant's counsel, claiming that the jury *can and ought to find, that in law the paper is no libel.* This was perhaps the object of Lord Holt, in the remarks he made,—and not that

the jury should decide, whether the matter was *libellous* or not. Unless we so understand the whole charge, taken together, the *direction* is not only inconsistent with a charge given by the same learned judge two years before in *Fuller's case*, but with itself. But suppose he submitted the *tendency* of the publication to the jury, upon the ground that it was a *mixed question* of law and fact,—this would not sustain the position, that the jury were the ultimate judges of the law.

The case of *Rex* v. *Oneby*, 2 Str. 766, was in 1727, and came before the King's Bench, while Lord RAYMOND was Chief Justice. The indictment was for murder, and the whole court, as Lord RAYMOND states, " say, that in cases of this kind the judges are to determine what is *malice*, or what is reasonable time to cool ; and they must do it upon the circumstances of the case ; and the jury are *only* judges of the fact ; and we must determine, whether it be deliberate, or not." Hence the court say, " in summing up the evidence, the judges direct the jury, *if you find such facts, it is so, if not it is otherwise ;* and they return either a general or special verdict." Under such a charge, though the questions of fact and law may be blended together by the form of proceeding, and cannot be separated upon the record, yet the distinction may well be preserved by the intelligence and integrity of the jury, notwithstanding they may elect to return a general verdict.

Though in *Oneby's case* there was a special verdict, yet it is evident, that the judges did not consider, that they were any more the judges of the law in such a case, than when both questions were blended together. It seems from the report of that case, that the practice of the courts in criminal cases to give *hypothetical* directions to the jury, was then well known. Ld. Raym. 1485.

In the case of *King* v. *Clark*, in 1729, Barnard. 304, Serjeant Hawkins claimed to the jury, that the charge of a malicious and traitorous design was not made out by the evidence ; and Ch. J. RAYMOND told the jury, that the fact of printing and publishing was only in issue to the jury.

*Franklin's case* was tried in 1731, 9 Harg. State Trials 275, before Lord RAYMOND, which was a prosecution for publishing what was called the Hague letter ; and the court charged the jury, that they had only to consider the question of publication, and the truth

of the inuendoes; and whether the defamatory expressions complained of amounted to a libel, or not, was matter of law only, and of which the court *are the only proper judges;* and that they are not to invade one another's province; and that matters of fact and of law are never to be confounded. *Zenger's case* was tried in 1735, before the provincial court of New York; and though strong ground was taken, that the jury were the judges of the law, yet Ch. J. De Lancy modestly told the jury, that as the facts or words in the information were confessed, the only matter, which could come in question before them, was whether they constituted a libel, *and that was matter of law, which they might leave to the court.* 9 Harg. State Trials 297.

*Owen's case* was tried before Lord Ch. J. Lee in 1752, 10 Harg. State Trials 196, and he told the jury, if the publication were proved, (there being no question as to the meaning,) *they could not avoid bringing in the defendant guilty.* This direction *excludes* the idea, that the jury could pass upon the law. *Nutt's case* was tried before Ch. J. Rider prior to 1756, while Lord Mansfield was Attorney General, and went to the jury under a charge, that they could pass *only* upon the facts, and the judges *only* upon the law. *Shebbeare's case* was tried before Lord Mansfield soon after he was appointed chief justice, in 1756; and he says " his *direction* to the jury then was, and had been *uniformly* since, up to the time he gave the opinion of the court in the case of the Dean of St. Asaph, (1784,) that if the jury were satisfied of the publication, and that the meaning and innuendoes were as stated, *they ought to find the defendant guilty,*— leaving the question of law upon the record for the judgment of the court." In *Woodfall's case,* 5 Burr. 2661, tried before Lord Mansfield in 1770, the *direction* was the same in substance, and approved of by the King's bench in bank. Lord Mansfield uses this language,—"*we all again declare our opinion, that the direction was right.*"

It has sometimes been claimed, that Lord Mansfield, in 1777, on the trial of *John Horne,* 11 Harg. State Trials 287, advanced the doctrine, that the jury were the judges of the law. But it is said, that case was reported from minutes taken in short hand at the trial; —yet it is evident, take it as reported, that he did not intend to submit but two points to the jury, the *publication* and the *meaning of it.*

In regard to what is said by Lord MANSFIELD about the *seditious intent*, he evidently speaks of it, as a matter of fact, and to aid the jury in coming to a right conclusion as to the *application* of the matter charged to be libellous,—it being a question, whether it related to his Majesty's government, or not.

In 1784, the Dean of St. Asaph was tried for a libel before Justice BULLER; and Lord Erskine, the great champion of the doctrine, that jurors are the judges of the law in criminal cases, was of counsel for the defendant, and warmly contended for his favorite doctrine; but he was overruled by BULLER, Justice. See Lord Erskine's speeches, p. 123. BULLER told the jury, in the most explicit terms, " that whether the matter charged in the information was a libel, or not, was a question of law for the court to pass upon, and and not the jury." And he adds, that he gave the same direction to a jury at the Guildhall sessions, not three weeks before that time, and says, " the law has been *so held* for more than a *century* past. The ruling of Justice BULLER was fully sustained by the King's Bench. See 3 Term R. 428, n. *a.* 1 Ersk. Sp., p. 210. The argument of Erskine was able, and embraced about all that can be said on that side of the question ; but the court thought it fallacious ; and he could not induce them to overturn what they conceived to be the settled law. The opinion of Lord MANSFIELD in that case cannot well be surpassed. Lord MANSFIELD in substance declares, that the charge of Justice BULLER was according to the *uniform judicial practice* since the revolution of 1688 ; and he adds, " *such a judicial practice in the precise point from the revolution, as I think, down to the present day, is not to be shaken by general theoretical arguments, or popular declamation.*" Lord MANSFIELD had, at that time been for twenty eight years chief justice of the King's Bench, and, for many years before, had been Solicitor General, and also Attorney General, and most intimately acquainted with the *juridical* history of his own times and the preceding age; and he must have understood the true state of this controverted question better than it is possible for any man to do at the present day. He had the advantages of his own wide experience, *traditionary* intelligence, and manuscript notes of cases, and reported decisions ; and the testimony of such a man, as to the true state of the law on this question, is not to be easily shaken.

BULLER, in his charge to the jury, says, " I do not know any ques-

tion in the law, which is more thoroughly established, than that is. And that the law has been so held, for more than a century." The opinion of a man of Justice BULLER's learning and experience should have no inconsiderable weight in regard to the judicial history of this question. No case has been cited, since the Dean's case, in England, showing that that case was not decided according to the uniform course of decision, and none to my knowledge exists. It was followed by Ch. J. KENYON, 3 T. R. 428, in the case of *Rex* v. *Withers*, in 1789, and no question was raised as to its correctness. So, also, in *Stockdale's Case*, in the same year, though Erskine was again counsel, and contended warmly for his favorite doctrine. 1 Ersk. Sp., p. 392.

In the trial of libel cases, the attention of the jury was confined to the question of publication and to the truth of the inuendoes in those cases, *only*, in which there was no attempt at justification. If there was an attempt to justify, as was held in the Dean's case, it was for the court to tell the jury, whether the matter offered amounted to a justification in law, or not, and for the jury to find, whether it was proved; and the jury were bound by the *direction* of the court. See 3 T. R. 428. The question of law in such a case does not arise upon the record, and can only be given *hypothetically in charge;* and the jury, as I think, are bound to follow their direction; though by a general verdict of acquittal they can, if they will, confound the law and fact, and follow their own caprices, *as to the law*, instead of the direction of the court; and this results from the fact, that courts will not grant new trials upon verdicts of acquittal, —for the best of reasons, as I shall hereafter attempt to show; as it would be but to do a nugatory act, and not because the jury were rightfully the paramount judges of the law. In an information for a libel, whether the matter charged is a libel, or not, is on the record, and may be tried on a motion in arrest after a verdict of guilty; and it is for this reason the court assumed the ground, that they were not bound to decide the question on the trial before the traverse jury,—and not because the verdict, in such a case, was a special one; though it may be said to be somewhat in the nature of such an one.

It has always been admitted, on trials for a libel, that in cases, where an *innocent act* is made *criminal*, and when done with a *particu-*

*lar intent,* there the *intent* is the material fact to constitute the crime ; and it is, of course, for the jury to find.  But it has been maintained by high authority, that a *criminal intent* is an *inference of law,* from the doing of a thing *in itself criminal,* without a lawful excuse ; while, on the other hand, it has been maintained, that the *intent,* with which an act is done, as well as the tendency of the libel, are in all cases questions of fact for the jury.  It is not my purpose to examine the merits of this question.  All that I wish to say is, that those libel cases, where it has been held, that the *intent* and the *tendency* should be submitted to the jury to find, upon the ground that they were in all cases questions of fact, or a mixed question, cannot be in point to show, that the jury were the judges of the law ; while, on the other hand, the cases in which the court have refused to submit the *intent* or tendency to the jury, on the ground, that they were an *inference of law,* are pregnant authorities to show, that the court denied the right of the jury to pass upon the law.

I propose to take a review of the cases, which have arisen in this country, somewhat at length, and see how the weight of authority now stands here.

In 1792 we find an essay from the very able pen of Judge Addison, of Pennsylvania, upon the duty of courts and juries, as to law and fact; and he maintains, that the jury have the right only to pass upon the facts in a criminal case, with great ability.  See Addison's Charges to Grand Jury, No. 6, p. 53.  In 1793 the question was raised on the trial of *John Bell* for murder.  Addison's R. 156.  The court tell the jury, they *are the mouth of the law;* and that it is their province to find the facts, and the province of the court to *declare the law;* and that no argument is more dangerous, than that, which must derive its force from the confounding of the authority of the court and the jury.

In 1794 *McFall* was tried, also for murder; and in that case the court maintain the same doctrine, and tell the jury, " that what facts constitute one kind of homicide, or another, is a question of law purely ; and when the facts are ascertained, nothing remains but a question of law, to be decided by the court."  Addison's R. 255.  Both of these cases were tried on a plea of not guilty, and both of the respondents were found guilty of murder under the charge of the court, and both sentenced to be hung.  I am not aware, that in Pennsylvania a different doctrine has ever obtained.

Though in the *Commonwealth* v. *Knapp*, 10 Pick. 497, and *Commonwealth* v. *Kneeland*, 20 Pick. 222, the opinion seems to be advanced, that the jury are the judges of the law in a criminal case, yet it is quite evident, that this opinion was thrown out without examination; and when this question came directly before the Supreme Court of Massachusetts in 1845, in the case of the *Commonwealth* v. *Porter*, 10 Met. 263, they repudiate the doctrine, that the jury are the judges of the law, as opposed to principle and reason. The case seems to have had the mature consideration of the court; still, I do not myself see any sufficient ground, why, under the decision of the court, the counsel for the defence should argue the law to the jury, as it was held they had the right to do. The only reason which occurs to me is, that, possibly, it might be supposed to aid the jury in applying the law to the facts found by them, as they should have it in charge from the court.

In New Hampshire, in 1842, two cases were tried,—*State* v. *Small*, and *State* v. *Pierce*, before Ch. J. PARKER, both for a violation of the license laws,—in which he charged the jury, that the court were the judges of the law, and the jury were bound to take the law from the court. See Pamphlet Report of these cases. The case of *State* v. *Pierce* went to the Supreme Court, upon a writ of error, and the *direction* to the jury was sustained by the full bench; and the opinions are very able and do great credit to that court. *Pierce* v. *State*, 13 N. H. 536.

In the case of *Townshend* v. *State*, 2 Blackf. 156, which was a prosecution for selling spirituous liquors without license, we find, in a very able opinion of Justice HOLMAN, all the leading authorities and arguments fully and ably considered; and the result, to which the court came, was, that the jury were not judges of the law, either in a criminal or civil case. The court say, " the jury are bound to find the law, as it is propounded to them by the court." They may, indeed, find a general verdict, including both law and fact; but if, in such verdict, they find the law contrary to the instructions of the court, they thereby violate their oaths." BLACKFORD, J., dissented; and when the cases of *Warren* v. *State*, 4 Blackf. 150, and *Armstrong* v. *State*, 4 Blackf. 247, came up, the judges, who made the decision in *Townshend's case*, had left the bench, except Justice BLACKFORD; and he and his new associates held, that,

in criminal cases, the jury were the judges of the law;—thereby re-pudiating the doctrine of *Townshend's case*, and establishing his own dissenting opinion as the law of that state. With us the cases are to stand upon their own merit; and are only valuable, so far as they evince legal learning and soundness of views; and I am quite willing to leave these cases with the American bar. If I mistake not, (not now having the cases before me,) Justice BLACKFORD rests his opinion solely upon the ground, that the jury have the pow-to decide the law under their general verdict; and hence he inferred they had the right.

In 1830 the case of *Montee v. Commonwealth* came before the court of appeals in Kentucky, 3 J. J. Marshall's Rep. 132, upon a writ of error, complaining that the court had no right to instruct the jury as to the law in a criminal case. Though it is conceded in that case, that the jury are *incidentally* and in one respect the ulti-mate judges of the law,—that is, if they *acquit*, the judge cannot grant a new trial, no matter how much they have misconceived or disregarded the law,—yet the court say, they have *no moral right* to contemn and override the direction of the court; and they cite with approbation what was said by Wynne, in his Eunomus, in regard to the maxim, "*ad questionem facti;*" when he remarks, that the jury are the *only* judges of the fact; and he asks, is it not equally within the spirit of the maxim, *that judges, only, have the competent cogni-zance of the law?* See, also, *Montgomery v. State*, 11 Ohio 427. The constitution of that state provided, that in all indictments for libels the jury *shall have the right* to determine the *law and the facts, under the direction of the court, as in other cases.* The court say, it would seem from this, "that the framers of our bill of rights did not imagine, that juries were rightfully judges of the law and fact in criminal cases, independently of the directions of the court. Their right to judge of the law is a right to be exercised *only* un-der the direction of the court; and if they go aside of that direction, and determine the law incorrectly, they depart from their duty and commit a public wrong,—and this in criminal as well as in civil cases.

In the case of the *United States v. Battiste*, in 1835, 2 Sumn. 240, 243, Judge STORY states it as the opinion of his whole profes-sional life, that the jury are no more the judges of the law in a cap-

ital or other criminal case, upon a plea of not guilty, than they are in every civil case tried upon the general issue; and though they have the *physical* power, yet they have not the *moral right*, to decide the law according to their notions or pleasure ; and he adds, " it is the duty of the jury to follow the instructions of the court."

The *State* v. *Jones*, 5 Ala. 666, (1843) has been cited as an authority to sustain the decision of the court in the present case. It is said in that case that, " as the jury may find a general verdict in a criminal case, they are judges both of law and fact, and may, if they think proper, disregard the opinion of the court upon the law." This question came directly before the Alabama court, in the case of *Pierson* v. *State*, 12 Ala. 153, in which the doctrine of Judge STORY is adopted, as sound;. and the case of the *State* v. *Jones* is explained and limited, and put upon what, I think, is the true ground, that is, that the jury have only the *physical power* to disregard the opinion of the court, if they will,—not the *moral* or *legal right*. In the case in 12 Ala. R., the court use this language, " the jury have no right to judge of the law, or control over it, *except what grows out of their right to return a general verdict of not guilty*."

It has been supposed, that the case of *Holden* v. *State*, 5 Georgia 441, was in unison with the present decision; but upon a recurrence to that case, it will be seen, they have a statute, which enacts, " that on every trial of a crime, or offence, the jury shall be judges of the law and fact, and must give a general verdict of guilty, or not guilty ;" and the case is put exclusively on the statute.

The case of *Patterson* v. *State*, 2 English 59, also rests upon the Constitution of Arkansas, and a statute of the state, " which make the jury the judges of the law, as well as of the evidence."

It is true, that Justice BALDWIN, in the case of the *United States* v. *Wilson & Porter*, 1 Baldwin's C. C. Rep. 99, on the trial of Wilson, tells the jury, "they are, in a crminal case, judges of the law and fact, and are not bound by the opinion of the court; and if they should differ from the court, they must find their verdict accordingly." But when Porter's trial came on, page 108, same book, and the counsel, knowing what the court charged the law of the case to be on Wilson's trial, appealed from the court to the jury with masterly powers of intellect and eloquence, to induce them to override

the decision of the court, Judge BALDWIN seemed to be disposed to recede from the ground, which he had taken on the trial of Wilson.  He here tells the jury, " if they *acquit,* the court cannot grant a new trial, though they differ from the jury as to the law; and in this respect they are judges of law, if they choose to become so ; and that their judgment is final, not because they settle the law, but because they do not think it applicable, or do not choose to apply it to the case ; and that this is what is meant by *the power of the jury to decide on the law."*  What Judge BALDWIN on the first trial called a *right* in the jury, he here calls a *power;*—not because the jury settle the law, but because their judgment, if they *acquit, is final.*

The case of the *United States* v. *Shive,* 1 Baldw. 510, was a prosecution for passing counterfeit money on the Bank of the United States.  The ground assumed in the defence was, that the law chartering the Bank was unconstitutional; and when the counsel claimed, that the jury were the judges of the law, and pressed upon them the opinions of politicians, high in authority,—as to the unconstitutionality of the law, the court came out, and told the jury in the most authoritative manner, that this was not an open question, and *was not for the consideration of the jury,* and that the decision of the supreme court was binding both upon *the court and jury.*

But, if it be true, that the jury are the judges of the law, and that there can be no legal conviction without the *concurrent opinion* of the court and jury *in matter of law,* against the accused, this is all wrong.  Though the opinion of the supreme court might be binding upon the circuit judge, it could not be upon the jury ; and to admit that it would bind the jury would be to give up the question.  The *validity* of the law was involved under the plea of not guilty ; and if the law was unconstitutional, the accused was not guilty of the offence charged in the indictment.   Hence, if the jury are the judges of the law in a criminal case, they must, in passing upon the guilt or innocence of the accused, pass upon the *validity* of the law.  The *decision* of the jury, if it may have that appellation, in no case settles the law, or becomes a rule of action for another jury, in a like case.   The opinion of the supreme court is no more binding upon the jury, than the opinion of the circuit judge at the trial ; and if the jury had *acquitted* Shive against the charge of the court, it would have *been final.*  They had the *physical power* to do it ; but,

State *v.* Croteau.

as I hold, this does not give the *legal power*, or *moral right.* If, upon the issue of not guilty, which may involve matter of fact, and incidentally matter of law, the accused has the right to have the jury pass upon the whole issue, the case of Shive cannot form an exception. To claim it would be, in effect, to abolish the rule contended for.

Judge THOMPSON, whose judicial learning and experience, while on the bench of the Supreme Court of New York and on the bench of the United States, were very extensive, thus wrote to a friend some short time before his death; "I have repeatedly," he says, "ruled on the trial of criminal cases, that it was the *right*, as well as the duty, of the court to decide questions of law; and any other rule, it appears to me," he adds; "would be at war with our whole judicial system, and introduce the utmost confusion in criminal trials. It is true," he says, "the jury may disregard the instructions of the court, and in some cases there may be no remedy. But it is still the right of the court to instruct the jury on the law, *and the duty of the jury to obey the instruction."*

In the libel case of *The People* v. *Crosswell*, in 1804, 3 Johns. Cas., Appendix, p. 337, which was tried before Ch. J. LEWIS, he charges the jury in conformity to the law, as settled in England in the case of the *Dean of St. Asaph;* and upon a motion for a new trial for a misdirection of the judge, the question was argued before four judges, who were equally divided on the motion. KENT and THOMPSON, Justices, were for granting a new trial, and LEWIS, Ch. J., and LIVINGSTON, J., were opposed to it. The ground assumed by KENT was, that the *intent*, in all cases, was an inference of fact, and in no case an inference of law; and this was probably the only ground, upon which THOMPSON advised a new trial. KENT, however, argued, that the jury were the judges of the law, and must *resolve* both law and fact, upon a plea of not guilty, unless they chose to return a special verdict. The opinion of KENT, J., is able; but he is opposed by an opinion of the Chief Justice, equally able.

The result of this division of the court was to deny a new trial ; but no motion having been made for sentence on the verdict, until the statute of 1805 became a law, the court unanimously awarded a new trial. It has been said, that this act of the New York legislature furnishes conclusive evidence, that that body understood the

law then to be settled, that juries were, in criminal cases, *generally both judges of the law and the facts.* But if it were so, I apprehend the opinion of the legislature would not be of the highest authority; I think, however, that no such conclusion is to be drawn from the act itself. It will be remembered, that in England the great contest in libel prosecutions was, whether the jury should find a defendant guilty upon finding the publication and the truth of the inuendoes, leaving the court to decide upon the question, whether the matter charged was libellous, upon a motion in arrest, or whether the whole should be passed upon by the jury upon proper instructions from the court, under the plea of not guilty. It was, I think, the only object of the statute to settle that controversy. The preamble to the act recites, that, " doubts exist, whether, on trial for a libel, the jury have a right to give their verdict on the whole matter in issue." And the statute enacts, that the jury shall have a right to determine *the law and fact,* under the *direction* (not the advice) of the court, *in like manner as in other criminal cases;* and that they shall not be directed or required to find the defendant guilty, merely on the proof of publication and the inuendoes.

But how are they to decide the law? The statute answers, under the *direction* of the court; that is, they are under the *direction* of the court, as I understand it, to return a general verdict of guilty, or not guilty; and this verdict will necessarily be compounded both of *law and fact;* and in this sense, it may be said, that the jury *resolve* both law and fact. But does it follow from this, that the jury have a right to disregard the instructions of the court on the law, and set them at nought? If so, they do not decide the case *under the direction* of the court, but against it. It may indeed be said, that the term in the statute, *direction, ex vi termini* implies an obligation upon the jury to follow it. If, when the statute says, the jury shall have the right to decide both law and fact *under the direction of the court,* it was meant to create them the paramount judges of the law, it would seem to follow, that their decision should be final, whether for, or against, the defendant. But in the proviso the right to arrest the judgment is expressly reserved to the court, as it had been before practised; and I have no doubt, if the jury convicted the defendant against the charge of the judge, the court would grant a new trial; and this, I think, is exercising the right to resolve

both the law and the fact under the same qualifications and limitations, as the jury could do *in other criminal cases.*

It is true, that upon the trial of *Stone* for a libel, in 1842, before Mr. Justice KENT, he seemed to think, that in that state, upon such a prosecution, the jury are the judges of the law and fact, and so charged them. But this I understand to be in consequence of the construction, which he gave to a provision in their state constitution. The same accomplished jurist lays it down, in that very case, " that in all criminal cases, except those of libel, the law is laid down by the court, and the jury are merely the judges of the facts." And though the jury can exercise their power to bring in a general verdict of not guilty, against the charge of the court, and none can dispute it, yet he says, *" it is their power, not their right."* See the Report of Stone's Trial in the New York Express of May 17, 1842.

In a recent case in the state of New York, *People* v. *Pine,* 2 Barb. Sup. Court R. 566, in a capital case, the court charged the jury, in substance, that they were only to determine the facts; that the court were the only judges of the law, and that they were bound to take the law from the court; and under this charge of the court Pine was convicted, and was subsequently executed.

In *Dorr's trial,* in Rhode Island, for treason, the charge of the court was the same. See Pamphlet Trial, page ——. And even in Texas, the conservative spirit of their courts have held, that in criminal trials it is the duty of the jury to look to the court for the law, and that the court is the only *organ and expositor* of the law. *Nells* v. *State,* 2 Texas 280. And in the case of *Handy* v. *State,* 7 Missouri 607, the court who tried the cause charged the jury, that they were the judges of the law and the fact; and a conviction followed; and upon a writ of error the judgment was for this cause reversed.

It has been said, that the Sedition Act of 1798 furnishes evidence of the sense of the profession, and *of the people,* at that early day, on this question, and shows that it was then understood, that the jury were the judges of the law.

But I apprehend, that this argument is without force. The third section of the act of Congress of the 14th of July, 1798, after providing for the giving of the truth in evidence, proceeded to declare, that the jury should have a right to determine the law and the fact,

*under the direction of the court, as in other cases.* The words, " as in other cases," cannot go to show, that a right existed in the jury to decide the law, and that this was so well understood, as to become a general rule of action. A provision similar has been introduced into several of the state constitutions, and, among them, into the constitutions of Ohio and Kentucky. See *Montgomery* v. *State,* 11 Ohio R. 427. The court say, speaking of their constitution, that it could not be imagined, that the jury were the judges of the law and fact in a criminal case, independent of the court; and if they go aside of their direction, and determine the law incorrectly, they committ a *public wrong.* In *Montee* v. *Commonwealth,* 3 J. J. Marsh. (Ky.) R. 151, the court say, " the provision in their state constitution clearly defines, how the jury may *determine* the law and fact, and what shall be the province of the court; and that it presupposes, that in all cases, except libels, which it provides for, the court had a pre-existing acknowledged right to *direct* the jury as to the law, leaving the jury then to decide the whole case, compounded of law and fact." This is precisely what is done in a civil case, upon a plea of the general issue, when questions of law are raised on the trial.

I apprehend no argument can be drawn from the libel act, as it is called, of 32 George III, in favor of the general proposition, that juries are the judges of the law in criminal cases. The preamble recites, that *doubts* had arisen, whether, in prosecutions for libel, the jury should give their verdict *upon the whole matter in issue.* The act provided, that they might give a general verdict of guilty, or not guilty, upon the *whole matter* put to issue on the indictment, or information, and that they should not be required to find the defendant guilty merely on proof of the publication and of the sense ascribed to the same. The second section provides, that the court, on every such trial, shall give their opinion and *direction* to the jury on the matter in issue between the king and the defendant, in like manner as in other criminal cases. The statute also provides, " that it shall not be so construed, as to prevent the jury, in their discretion, from returning *a special verdict,* as in other criminal cases." And the statute expressly reserves the right of the defendant, upon conviction, to move in arrest of judgment on such ground and in such manner, as he had the right to do, before the passage of the act.

State *v.* Croteau.

Lord Erskine is said to be the father of this bill, though introduced by Fox and seconded by Erskine; yet not one word is said about the jury being judges of the law. They are to give their verdict upon *the whole matter in issue,*—and how? Under the *direction* of the court, *as in other criminal cases.* And what matter is put in issue to the jury? The law is never proved or put in issue to the jury. Though in actions of tort, as in trover, matter of justification may be given in evidence under the plea of not guilty, and upon which questions of law may arise on the trial, yet they are not in issue to the jury. The plea is simply a denial of the declaration. So, to an indictment, matter of justification may be given in evidence under the plea of not guilty; and though the question, whether the matter set up in justification is proved, or not, is for the jury, yet its legal sufficiency is not in issue to the jury, any more than it would have been in a special plea..

The provision in the act, that, upon conviction, the defendant may file his motion in arrest of judgment, is, in effect, a denial that the jury are to *decide* the law, simply because they pass upon the "*whole matter in issue.*" The law can be no more *in issue* to the jury, upon an *acquittal,* than upon *conviction.* If, however, they acquit, there is no need of a motion in arrest. Ch. J. Best, in *Levi v. Milne,* 13 E. C. L., 398, speaking of the libel act, though in a civil case, says, "I mean, however, to protest against juries becoming judges of the law, even in criminal cases. The act only says, they may find a *general verdict.*" And he emphatically asks, "has a jury, then, a right to act against the opinion of the judge, and return a verdict on their own construction of the law?" "I am clearly of the opinion," he adds, "that they have not." See also *King v. Burdett,* 6 E. C. L. 368, in which Ch. J. Best is very explicit, that the court are to judge of the law, in libel as in all other cases; and that the statute only conferred upon the jury the right to find the *intent,* with which the publication was made. It would seem, however, from the case of *Baylis* v. *Lawrence,* 39 E. C. L. 270, that a practice had been adopted in civil actions for a libel, to leave it to the jury, under all the circumstances, to say whether the publication amounted to a libel, or not; and that this practice is analogous to the enactment of the libel act, which only relates to criminal cases; but it has been treated as a declaratory act by some judges; and the

question, whether the publication was a libel, or not, has been regarded as a mixed question of law and fact, depending upon the nature of the publication and the *intent* with which it was made. On a motion in arrest, however, it becomes a pure question of law, whether the matter is *libellous.*

Some general considerations would seem to lead the mind to the conclusion, that it cannot be a reasonable or a sound doctrine, that the jury are rightfully the judges of the law in a criminal case.

The idea, that the law, which is supposed to be a *certain* rule of action, should be, on every criminal trial, what a jury of twelve men should be inclined to make it, subject to no control, or review, and liable to be perverted, through prejudice, and the popular outbreak of the day, has not, I confess, after mature consideration, received with me any special favor. It has never been claimed, that the jury have the right to judge of the law in a case, where the question of law arises upon the record; and it must be admitted, that the jury, upon a plea of not guilty, are not the judges of the law for the purpose of *conviction.* If they convict, under improper instructions from the court, the defendant may have his exceptions and reverse the case upon error; and if the conviction be against the *direction* of the court, the same court will order a new trial.

This is as well settled in criminal as in civil cases,—and is conclusive, that the jury cannot be the judges of the law for a *conviction.* If at all, it must be only for acquittal; and is it true, that jurors are the legitimate judges of the law for such a purpose? Is such a doctrine necessary for the individual safety and security of the citizen? I am not apprehensive, a jury would often, if ever, go against the *direction* of a judge to *acquit* a prisoner in humble life, unless in a case involving some exciting topic, or where the law, which should be attempted to be enforced, might be deemed unpopular. It will be in the case of the *rich and influential,* where crime is sometimes found in its most appalling character, that a jury will be met with the choicest talents that grace the bar, and every effort made, which genius or sophistry can devise, to carry them away from duty, and to induce them, by the most captivating addresses, to take ground against what may well be supposed will be the *direction* of the court, under the plea, that they are the *paramount* judges of the law; and it will be more than hinted, that the court are preju-

diced against the accused, and hence the necessity, that they should assert their right to decide the law. If the jury are the ultimate judges of the law, the exercise of this right should be cordially yielded to them. They should be fully addressed upon the law, which they are called to decide, and the authorities should be produced and read, and they should be fully possessed of the cases, and be enabled to compare them, one with another, and mark out the distinctions upon which they rest.

It would seem to follow, from the oath administered to the jury, that they are only to decide facts. It is the theory of most governments, that justice is to be administered under the sanctions of an oath. The judge is sworn to an impartial administration of the law ; and in Hale's Pleas of the Crown, vol. 2. p. 292, we have the oath, as administered to the jury in a criminal case, which is as follows,—" You shall well and truly try and true deliverance make between our Sovereign Lord, the King, and the prisoner at the bar, whom you shall have in charge, (and true verdict give,) *according to your evidence.*"

There is no obligation, in this oath, imposed upon the jury to decide the law correctly ; and they are not sworn to make that *their rule of decision;* but the only rule given them in the oath is, *according to their evidence.* If the jury decide the law, justice is administered, so far, without the sanction of an oath,—which contravenes the very principles of the constitution of the English government, as well as our own.. The jury are sworn, " well and truly to try ;" but should they be sworn thus to try matter of law, of which they are and must be supposed to be ignorant ? The facts they can learn on the trial, but not the law. The facts are given in evidence, but not the law ; and consequently the law is no more involved in .the finding of a jury in a criminal case, under a plea of not guilty, than it would be in a civil case, under the same issue. The form of the oath administered to jurors, under our statute, gives the same rule, by which they are to be governed in making their verdict, in both civil and criminal trials. The rule, as expressed, is, " according to the evidence given them in court, and the laws of this state." No one supposes, this oath binds, or authorizes, the jury to decide the law in a civil case ; and can it be claimed, that it should any more in a criminal one ? In both, they are to find their verdict according

State *v.* Croteau.

to the evidence and the laws of this. state; but how according to the laws of this state? clearly as they shall have the law in charge from the court.

It is conceded, that, upon demurrer, the court are the only judges of the law arising from the facts admitted on the record. But if the jury are the judges of the law arising from the facts found by them, why not make them the judges of the law arising from facts admitted? Certainly it would be less embarrassing to them, than to decide both law and fact, when both were in dispute. It has been said, that, upon a plea of not guilty, the verdict of the jury is so *compounded* of *law and fact*, that the jury must necessarily decide both law and fact. But why so, any more than in a civil suit? The law and the fact may as well be kept separate, by means of a *hypothetical charge*, in the one case, as in the other. Lord Erskine, in his famous argument in the case of the Dean of St. Asaph, pushed this objection still farther; and claimed, that the words and nature of a verdict, in a criminal case, necessarily import, that the jury are the judges of the law and fact, and that they must necessarily decide, both as to the commission of the act charged, and also as to its *criminality*, because, he says, if the act were not criminal, a verdict of guilty would be *false*. But this argument proves too much; for it is a conceded point, if the jury find the defendant guilty, against the charge of the court, their decision is *not final*, and the court will set the verdict aside. It may be farther answered, that the jury, by a general verdict of guilty, find the facts to be true, which are alleged in the indictment, and so far as they are concerned they imply a crime, whatsoever the court may decide on a motion in arrest. Besides, a verdict of guilty is always to be understood *provisionally*, that is, guilty, if the facts are sufficiently stated in the indictment, and be such as constitute the crime attempted to to be charged. If the verdict was not by *implication provisional*, the court in no case could arrest the sentence after a general verdict of guilty.

It is a rule apparently without exception, that issues of law are ever determined by the judges, and only issues of fact go to the jury. 1 Inst. 71, C.

It is not claimed, that, upon a plea of not guilty, the jury are the judges of the admissibility of evidence. But if they are the judges

of the law, to be consistent, they should be. No question of law, in such case, is on the record ; and whether a given state of facts is admissible in evidence depends upon what shall be held necessary, in law, to make out the crime. The result, then, of the doctrine claimed to exist in this particular is, that the jury are the ultimate judges of the law, as to what facts must be proved, to make out the crime, and the judges decide what facts shall go to the jury. The only standard, which the court can have in relation to the admissibility of evidence, is, to determine in their own minds what is necessary to constitute the offence ; and, upon the theory now adopted, the jury have the right to overrule them.

It is admitted, the jury may return a special verdict, and thereby refer all questions of law to the court. It was once doubted, whether, upon common law principles, the jury were not *bound*, if required, to return a *general* verdict; but the contrary is well settled; and the rule now holds without exception, both in civil and criminal cases, that the jury may, if they choose, return a special verdict. 2 Co. Inst. 422, 425. *Dowman's case,* 9 Co. 11 *b*, and 12. 1 Co. Inst. 227 *b*. Staun. P. C. 165. *a.* 2 Ld. Raym. 1494. Hargrave's Notes to Co. Litt. 155 *b*, n. 276.

We think this is conclusive, to show that the jury are not constitutionally the judges of the law upon a plea of not guilty, any more than upon a *demurrer*. If they are, the *accused* must have the *right to demand*, that the jury should decide the law, and if not, he is deprived of a *constitutional right*. This cannot well be said to be a qualification of the right, which the accused may have, to call upon the jury to pass on the law. It is in effect an *abrogation* of the *right;* for how can that be called a *right*, which may at any time be *denied* by the very board, to whom the law has committed the security of *this right*, if it be one. If the defendant has the right to an *acquittal*, unless there is a *concurrence* of opinion both in the court and jury, that the law is against him, it is a sacred right; and it would be absurd to hold, that the jury could defeat him of this right by returning a special verdict, in their discretion.

If the jury, after finding the facts specially, also find their *conclusion* of the law from the facts found by them, this is not binding upon the judges ; but they have the right to declare the law, as they conceive it to be, and thus control the verdict. 1 Hale's P. C. 471.

2 Hale's P. C. 302. Staun. P. C. 155 *a*. 4 Co. 42 *b*. Plowd. 114 *a, b*. This is also at war with the opinion, that the defendant has the right to be acquitted, unless both court and jury concur in opinion in matter of law against the accused. When the facts are settled, the jury cannot control the verdict.

Though a jury can *acquit* upon a plea of not guilty, against the charge of the court, from the form of the proceeding, yet does it follow, that they ought so to do? They may return a verdict of not guilty, in a civil suit, against the charge of the court; but no one supposes they ought to do it; and if they do, the court will grant a new trial. So if they convict in a criminal case, against the charge of the court, the same result will follow; but if they *acquit*, it is *final*; and from this it is supposed to follow, that the jury are rightfully the judges of the law in a criminal case,—though the advocates of this doctrine are constrained to admit, that it is for the simple purpose of an *acquittal*. I apprehend, that the conclusion is altogether *illogical*. It is a *maxim* of the common law, as old as the common law itself, that " *nemo bis punitur, aut vexatur, pro eodem delicto* ;" and *this maxim* has, in effect, been incorporated into the constitution of the United States, which provides, that no man "shall be put twice in jeopardy for the same offence." A liberal construction, as it should have been, has always been given to these provisions, in favor of the accused ; and if the verdict be rendered upon such a proceeding, that, upon a conviction, the court might have legally passed sentence, upon an *acquittal*, in such a case, there can be no second trial, though the jury acquitted against the charge of the court, or through a misdirection of the judge. To grant a new trial, in such a case, would be but to give the accused an opportunity to use his former acquittal as a defence, and would be a useless and nugatory act in the court, which they will never do. This, I conceive, is the true reason, why the law has been settled, that no new trial can be had after an *acquittal*, though it is otherwise upon conviction ; and the same reason has led the legislatures, who have passed laws providing for bills of exceptions on criminal trials, to confine this right to the defendant, upon a conviction. If *acquitted*, he would not need his exceptions; and if the case were opened upon exceptions by the government, the defendant could avail himself of the provision in the constitution, which has been referred to, and which is the supreme law of the land.

State *v.* Croteau.

Though a writ of error is regarded as a writ of right, and is so, still it will not lie for the Commonwealth, in a criminal case, to reverse an *acquittal.* *People* v. *Dill,* 1 Scammon 257. *People* v. *Royal,* Ib. 557. *Commonwealth* v. *Harrison,* 2 Virg. Cases 202. *State* v. *Reynolds,* 4 Hayw. 110, in the Court of Appeals in Tennessee. *United States* v. *More,* 3 Cranch 174. *People* v. *Corning,* in the Court of Appeals in New York, 2 Cow. 9. *Commonwealth* v. *Cummings,* 3 Cush. 212. The reasons, which have led to a denial of a writ of error in behalf of the Commonwealth, upon an *acquittal,* are the same, that would prevent the granting a new trial.

The judiciary of this state is a *co-ordinate* branch of the government, and intrusted with the administration of the law, and the whole law, both civil and criminal : and shall it be said, that, under our constitution, the duties of a jury are in certain cases judicial, and that a jury of twelve men, who are selected without any regard to their knowledge of the law, and, indeed, upon the supposition that they are not and cannot be acquainted with its principles, become, when empanelled to try a criminal case, a *co-ordinate branch* of the government? Yet if they are the paramount judges of the law, this must follow, and all the different juries, who may be brought together throughout the state, for the time being, become a *parcel of one of the co-ordinate branches of the government.* Can a doctrine, which leads to such consequences, prevail in the United States? And should it?—especially in this state, where our judges are elected annually by the immediate representatives of the people, also elected annually ? And can such a doctrine be wholesome, and is it necessary for the individual security of the citizen? Is not its legitimate tendency only to enable the accused to obtain an acquittal *against law,* through the caprice of a jury, or through their ignorance upon a subject, upon which they are not supposed to have and are not bound to have information? Though it may be true, that a jury would ordinarily follow the *advice* of the judge, and treat it, practically, as binding as a *direction* would be upon them, yet the danger would be in exciting trials, and where the law, which the government were attempting to enforce, was deemed unpopular. A jealousy of leaving the law to the court, in criminal trials, as in other cases, is, in the present state of things, the merest declamation.

XXIII.    10

Our judges are dependent upon the people, and the very tendency of an elective judiciary is towards the *popularity of the day.*

One of the leading arguments of Lord Erskine, to establish the point, that juries are the judges of the law in a criminal case, was to attempt to show, that by the ancient common law the jury not only had the right, but that they were bound to exercise it, in deciding the law, when it came before them upon the general issue, in a civil case,—and from that infer, that they must have had the right upon a criminal trial. See his argument before the King's Bench, in the case of the Dean of St. Asaph, 1 Ersk. Sp. 165.

The statute of Westm. 2, c. 30, passed as early as 1285, is made the basis of the argument of those, who claim, that juries were originally judges of the law in civil cases. Lord Erskine took the position, that from the words of the statute the right of the jury to decide the law, upon the general issue, was vested in them by the constitution; but he wholly failed to satisfy the court, that this was ever the law.

The statute enacts, that " the justices assigned to take assizes shall not compel the jurors to say precisely, whether it be disseisin, or not, so that they do show the truth of the fact, and require the aid of the justices ; but if they of their own accord are willing to say, that it is disseisin, or not, their verdict shall be admitted, *at their own peril."* This statute was doubtless passed to secure to juries the right, in case of assize, where a special issue was joined on some collateral matter, to return a special verdict, referring the law to the court, the same as if the issue were general.

Coke, in his Commentaries upon Littleton, sec. 366, speaking of an assize, says, that a special verdict may be given in any action, and *upon any issue,* be the issue general, or *special,* although there be some contrary opinions in the books; yet, he says, the law is now settled on this point. He cites several cases from the Year Books, and also the statute Westm. 2, chap. 30. This statute is generally considered as *declaratory* of the common law, and in affirmance of it. In section 367 Littleton remarks, " And as it is said of a verdict at large, (a special verdict,) in an assize, &c., so it is of a writ of entry, founded upon a *disseisin, and in all other actions,* where the justices will take the verdict at large ; the manner of the whole

entry is put in issue." And in section 368 Littleton adds, the jury may, in such case, where they may give their verdict at large, return a verdict generally, if they will, &c. Coke adds, although the jury may take upon themselves the knowledge of the law, and return a general verdict, *yet it is dangerous for them so to do,* as they run into the danger of attaint, if they mistake the law. But if they were constitutionally the judges of the law in civil cases, why should they be in danger of an *attaint?* The *implication* of the concluding clause of the statute is a strong argument, that the jury were not to decide the law. If, upon their own accord, "the jury are willing to say, that it is *disseisin,* or not, their verdict shall be admitted, *at their own peril."* If the statute gave the right to the jury, or affirmed a right of the common law, to decide the law in such a case, *what peril could they incur by exercising the right?* The statute implies, that if the jury will undertake to *decide the law,* they will incur such penalty, as they may be subjected to, for *exceeding* their jurisdiction.

I think Glanville, *lib.* 13, c. 20, 21, is a strong authority, to show, that the jury have no right to decide the law upon the general issue involving both law and fact, notwithstanding it has sometimes been attempted to explain it away. Glanville says, that the assize could not decide upon the law connected with *disseisin;* and that, if the demandant object to put himself upon the grand assize, he must show some cause, why the assize should not proceed; and, if the objection be admitted, the assize itself shall thereby *cease,* so that the matter shall be verbally pleaded and determined in court, *because it is then a question of law, &c.* If a sufficient reason be shown, *the assize* shall not proceed; and Glanville says, that an *assize* cannot decide upon the law connected with *disseisin;* consequently the assize shall for such cause *cease.*

In *Townshend's Case,* Plowd. 111, 114, the jury undertook to decide a question of law as to a *remitter,* and the court set aside their finding, as being against law. Though in this case the jury found the facts at large, yet if, in such case, they insist upon finding the law also, why may they not do it, if they are judges of the law? Why should the court set aside their conclusion? The true reason, as I think, is, that jurors are to try the facts, and the judges to decide the law arising from them, *for ex facto jus oritur,* and not be-

cause they find the facts at large, though this may enable the court to decide the law of the case.

In pleading, matter of law can never be traversed. If it could, it is said, " it would be to make twelve illiterate men try a matter of law, of which they have no knowledge." And it is added, " at the beginning of our law it was ordained, that matters of fact should be tried by twelve men of the country, where the matter arises, and matters of law by twelve judges of the law; and that it was not the office of the jury to try matters of law, but only matters of fact." *Willion* v. *Berkley*, Plowd. 223, 231; also *Grendon* v. *Bishop of Lincoln*, Plowd. 493, 496. BULLER, J., in his charge to the jury in the case of the Dean of St. Asaph, emphatically denies, that in civil cases the jurors were ever judges of the law in England; and I am not aware, that it has been ever claimed in this state, that in civil cases the jury were the judges of the law; though doubtless at an early day cases were submitted to a jury, without much separation of law and fact by the court. The argument, then, that the jury being judges of the law in civil cases, and from that inferring, that, upon a principle of equality, they must have the same right in a criminal case, must, especially in this state, fall to the ground.

Though the fact, that a verdict of acquittal *is final*, makes an important distinction between criminal and civil cases, yet it is *illogical* to infer from this, that the jury are the judges of the law in criminal cases. A reason for the distinction is to be found in the principle, that no man can be *put in jeopardy twice* for the same offence.

Blackstone, 4th vol., 361, has been relied upon to sustain the opinion of the court. He says, the jury may return a general or special verdict,—that is, where they doubt the matter of the law, they may leave it to the determination of the court, though they have an unquestionable right of determining upon all the circumstances and finding a general verdict, *if they* think proper so to hazard a breach *of their oaths; and if their verdict be notoriously wrong, they may be punished, and the verdict set aside, at the suit of the King*. This does not look as if Judge BLACKSTONE supposed the jury constitutionally the judges of the law in criminal cases upon a plea of not guilty; though he evidently, when he speaks of the *unquestionable right* of the jury, confounds it with *power ;* and it is, I think, confounding the *power*

with the *right*, that has occasioned so much difficulty on this question. I am ready to concede, that, if the constitution and the laws of England make jurors the *ultimate judges* of the law in criminal cases, then a power to decide the law may be equivalent to a *right ;* but this is taking for granted the very thing in dispute. If they have the power to *acquit* against the charge of the court, and such acquittal is *final only* because the accused cannot be put *twice* in jeopardy for the same offence ; then the power of the jury to decide the law against the charge of the court may, as was remarked by Judge Story in the case in 2 Sumn., be said to be a *physical power*, and is not *equivalent to right.*

It is a *fundamental maxim* of the law, that, *"ad questionem facti non respondent judices, ad questionem legis non respondent juratores."* All fundamental maxims are so plain and *intuitive*, as to be understood by all ; and the usual course, when the object is to go astray from them, is first to avoid them, and then attempt to prevent them. To get rid of the force of this *maxim*, it has been claimed, that it is to be confined to questions arising on the record. I am not aware, that it has been seriously claimed, that the court ever answer to matters of fact ; and if the jury are the *only* judges of the fact, is it not equally within the spirit of the maxim, that the court are the *only* judges of the law. The *maxim* is general in its terms ; and to confine the first part of it to questions of law, where the law and fact can be separated on the record, looks to me like a perversion of the language of the maxim. Certainly it is not so confined in civil cases. The fact, that the court have a common law power to grant a new trial on the ground that they may apprehend the jury have mistaken the fact, is no violation of the language of the *maxim*. The court do not settle any fact, but simply open the case, that the facts may be passed upon by another jury.

The opinion of Vaughn, Ch. J., in *Bushell's case*, Vaughn 149, 150, has been relied upon, as an authority for the limitation of this maxim,—but he says, " literally taken, it is true ; for if it be demanded, what is the fact ? the judge cannot answer ; if it be asked, what is the law in the case ? the jury cannot answer." It is true, Vaughn says, upon all general issues the jury *resolve* both law and fact *complicately*, and not the fact by itself. But I apprehend his meaning is, that in such case they may resolve the law as arising

out of the facts found by them under the *direction* of the court. The judge cannot, he says, tell the jury, that, upon such *evidence*, the law is for the plaintiff, or for the defendant; for this would be to *resolve* both law and fact; but he says, p. 144, if the judge shall, before the jury give in their verdict, ask them how they find such a particular thing propounded to them by him, and they answer, they find the fact so and so, and the judge shall then tell them, the law is then for the plaintiff, and you are accordingly to find for him, yet if they find for the defendant, this may be thought to be a finding in matter of law against the direction of the court, and so *vice versa*. But Ch. J. VAUGHN recommends the giving the instructions to the jury *hypothetically*, and not positively,—" that is, if the jury find the fact *thus*, then you find for the plaintiff; but if you find the fact thus, then it is for the defendant." It seems, then, that the mode of separating the law from the fact on a jury trial by means of a *hypothetical charge* was known at least as early as the 22 Charles II ; and the distinction of *law and fact*, in such case, may well be maintained by the integrity and intelligence of the jury.

Though it be granted, that a jury are exempt, in a criminal case, from all questions as to the propriety of their verdict, yet it does not follow from this, that they are the legitimate judges of the law. The proposition, that the power *conclusively* proves the right, if there is no legal accountability, proves quite too much. If it were true, the jury might rightfully acquit the defendant in all cases, without regard to the law, or the evidence ; for no one can question their power to do so ; and their exemption from all accountability for so doing, especially in this state, is equally clear. The *power* of the jury to acquit, against the charge of the court, arises out of the fact, that there exists no power or right to put the accused again on trial for the same offence ; and consequently the *power* does not prove the right a legal one, though the finding of the jury *be final*.

There are several instances, where jurors, *acquitting* notorious offenders, against clear and manifest evidence, and contrary to the direction of the court, have been punished in the Star Chamber, and have, also, in the King's Bench, and in courts of *oyer and terminer* and gaol delivery, been fined and imprisoned; and though Lord HALE, 2 Hale's P. C. 313, says, the long use of fining jurors in the King's Bench, in criminal cases, may give possibly a jurisdiction to

fine in these cases, yet that it cannot be extended to inferior juris-dictions; but I apprehend, it is settled law, that no one is liable to a prosecution for any verdict he may give in a criminal matter; and the reason would seem to be, that the safety of the innocent and the punishment of the guilty are so dependent upon an upright and fair course of proceeding by a jury, that it is of the utmost consequence, that they should be as little biassed as possible, for any cause what-ever; and therefore, lest they should be influenced by the fear of being harassed by a *vexatious* suit for acting according to their own consciences, the law will not leave any possibility for a prosecution of this kind. 1 Hawk. P. C., Chap. 72, Sec. 5. *Croenvelt* v. *Bur-well*, Ld. Raym. 469. The fining and imprisoning of jurors has been frequently declared, in parliament, an illegal and arbitrary in-novation; and of dangerous tendency to the government, and the lives and liberties of the subject,—but not because the jury are of right the judges of the law in criminal cases. The true reason is the one previously assigned. 2 Keble 180. *Bushell's case*, Vaugh. 135. 6 Har. St. Tr. 989.

I readily admit, that much may be and has been said on the oth-er side of the question, both in England and in this country; but I claim that the ground taken, will, on mature consideration, be found fallacious. Lord Erskine, who may be said to have exhausted the subject in his celebrated argument in the case of the Dean of St. Asaph, failed to convince the King's Bench, that the jury were the judges of the law in criminal cases; and the libel act of George II did not, as I think, make the jurors the judges of the law, even in libel prosecutions,—and much less does it recognize the doctrine, that they were in other criminal cases.

It may be said of the case of the *State* v. *Wilkinson*, 2 Vt. 480, that the question was only *incidentally* before the supreme court, and it was not involved in the decision then made. It is true, the chief justice, for whom I entertain the most profound respect, does say, " there is no doubt, that, in criminal cases, the jury are the judges of the law as well as the fact." But it is now conceded, in this case, that they are judges of the law only for an *acquittal;* and I apprehend that Ch. J. PRENTISS, upon mature examination, would as readily repudiate this whole doctrine, that jurors decide the law in criminal cases, as has been done by the Massachusetts court,

when brought to a full consideration of the question. The case of *State* v. *Snow*, 6 Shep. 436, was evidently decided with very little personal examination of the subject on the part of the court; and the cases to be found in Wheeler's Criminal Recorder can hardly be regarded as of any authority, even in the state of New York. The case of *State* v. *Allen*, 1 M'Cord's (South Carolina) Rep. 525, has been sometimes referred to on this question, but that case simply decides, that in that state the *intention* with which a publication is made, as well as the fact of publication and the truth of the inuendoes, are involved in the general issue; and the whole case, law and fact, is resolved by a general verdict. This simply puts libel cases on the same ground as other criminal trials. The law is not put in issue to the jury, but it is resolved, by means of a general verdict under the issue; and if it should be asked, how? my answer is, under the *direction* of the court.

The discussions, that have, at different times, taken place in libel prosecutions, are calculated to mislead on the question now before us, without a careful attention to the points in controversy. It was always conceded, that the fact of publication and the meaning were purely matter of fact, and exclusively for the jury; but when we come to the question of the *tendency* of the publication, and the *intention* of the publisher, a remarkable doubt has prevailed, whether they were *purely* questions of law, and to be abstracted from the jury on the trial, or whether they were *mixed questions of law and fact*, and to be submitted to the jury, with proper *directions* from the court, like any other *mixed* questions of law and fact. The essence of a libel consists in *its tendency* to produce mischief; and it has been insisted, that the *intrinsic illegality* of the publication is not a mere question of law, since it consists in its *tendency*; nor is it claimed to be a mere question of fact, but it has been sometimes treated as an ambiguous question in its nature, depending, for its solution, upon a sound judgment and discretion, applied to the alleged libel, and the state and circumstances of society, and not purely on a profound knowledge of the law on the one hand, or the aid of evidence on the other.

Treating, then, the *tendency*, and the *intention*, as a *mixed* question of law and fact, the cases, where the *intention* and *tendency* have been submitted to the jury, under proper instructions, to pass

upon, have no influence upon the question at bar; and *Thompson's Case*, 3 St. Tr. 37, the case of the *Seven Bishops*, 4 St. Tr., and possibly *Tutchin's Case*, may all be claimed to be of that description, and doubtless there may be others, where the same thing has been done.

This is precisely what must be done in civil actions, where there is a mixed question of law and fact, and it is precisely what has been done in civil actions for a libel. See *Fairman* v. *Ives*, 5 B. & Ald. 642. *Baylis* v. *Lawrence*, 11 Ad. & E. 920.

Considering, then, as I do, that the doctrine, now established by this court, is opposed to the current of adjudged cases in England and in this country, and to constitutional principles, and in violation of the harmony of the legal system, and unfit in the nature of things, and in no way necessary for the preservation of the liberty of the citizen and the protection of innocence and the wholesome administration of criminal justice, and especially unnecessary in a government, where there is an *elective* judiciary, like the one in this state, the tendency of which is towards popular feeling, I have not been able to bring my mind to concur with my brethren.

I should therefore hold, that the defendant should take nothing by his exceptions, whatever view we take of the case.