A. T. MONROE V. WM. SMELLY AND ANOTHER.

The courts will not enforce the collection of money won at a game of ten pins.

English and American common law decisions on the maintenance of actions founded on wagers reviewed and considered.

It is true, that by the Common Law of England an action could be maintained on a wager, although the parties had no previous interest in the question on which it was laid. But this proposition was always subject to the qualifications, that an action could not be maintained on a wager, if it was contrary to public policy, or immoral, or in any other respect tended to the detriment of the public; or if it affected the interests, feelings or character of a third person.

In the United States, the course of decisions on the subject of wagers has been very much the same as in England, with a stronger tendency in the later adjudications to treat all idle wagers as utterly void.

The uniform tendency of the later American decisions is to treat all gaming contracts, and all wagers, as utterly void.

In the true spirit and meaning of the exceptions to the old rule, all idle wagers, and all gaming contracts, may be properly held to be void.

This court has sustained wagers upon horse races, upon the idea that they rested upon somewhat different grounds, as respected their policy, from those of other wagers. It may be too late to question the wisdom and soundness of those decisions. But it is not disposed to go any further than it has already gone in sustaining actions upon wagers, or for the recovery of money, or property, won upon any game or wager.

APPEAL from Houston. Tried below before the Hon. R. A. Reeves.

Monroe v. Smelly.

See the opinion for the facts.

*Taylor & Moore*, for the appellant.

BELL, J.—This suit was instituted by the appellant against the appellees, upon a promissory note for one thousand and fifty dollars, given by the appellees to one Robert Hale, and transferred by Hale, after maturity, to the appellant. The defendants in the court below pleaded that the note was given for money won at a game called "ten pins." The evidence fully sustained the plea, and the presiding judge instructed the jury as follows: "If the jury believe from the evidence that the note read in evidence was given for money bet and lost at a game of ten pins, it cannot be collected by law."

The only question before us arises upon this charge of the court. In obedience to it, the jury found a verdict in favor of the makers of the note, and in favor of Monroe against Hale, by whom the note was endorsed. We have given the subject the most deliberate consideration, and our conclusion is that there is no error in the charge of the court below.

It is true that by the Common Law of England an action could be maintained on a wager, although the parties had no previous interest in the question on which it was laid. But this proposition was always subject to qualifications. These qualifications were, that an action could not be maintained on a wager, if it was contrary to public policy, or immoral, or in any other respect tended to the detriment of the public; or if it affected the interests, feelings, or character of a third person. It will at once be perceived that these exceptions to the general rule are of a nature to admit of great diversity of opinion as to the circumstances under which the rule itself ought to be upheld. These exceptions, or to speak more correctly, the rule and the exceptions taken together, are founded upon a principle which enables the law to adapt itself to the changing circumstances and conditions of communities and States. And it is perhaps the greatest glory of the common law, that it is, in its truest sense, both conservative and progressive in its tendencies. The exceptions to the general rule

of the common law on the subject of wagers, fall into two classes. One class is based upon a concern·for the interest of the public; the other is based upon a concern for the interests and feelings of individuals. In a merely political sense, a thing may be said to be contrary to public policy in one generation, which is not so in the next. And when the law institutes an inquiry into the morality or immorality of a particular thing, the inquiry does not proceed upon abstract principles, so much as upon the received and common opinion of the great body of the people constituting the political community upon which the law has its operation. So a thing, in contemplation of law, may be immoral to-day, which was not immoral fifty years ago. That may be held to be in strict conformity with sound morals, according to the public sense of the present day, which would have been condemned as immoral during the ascendancy of the Puritans in England, and of the Covenanters in Scotland.

On many subjects the law has never been declared by legislative enactments. It is supposed to rest in reason, and the courts have been left to apply the principle of sound reason to cases as they have arisen. The subject now under consideration, the extent to which actions at law could be maintained on wagers, is one upon which the legislatures of common law States have shown a disposition to follow the lead of the courts, and the decisions of the courts have, as nearly as possible, kept pace with public opinion—sometimes lagging behind, out of too great regard for precedents, and sometimes taking the lead when an extraordinary case would quicken the judicial mind. In the year·1777 the case of DaCosta v. Jones was tried before Lord Mansfield. The case arose about a bet upon the sex of the somewhat celebrated Chevalier D'Eon, a Frenchman, whose career had attracted public attention, and who chose to preserve as much mystery as possible in relation to his sex, which had become a subject of much interest in certain circles in the capitals of London, Paris, and St. Petersburg. On the first trial of the cause, the plaintiff obtained a verdict, on the evidence, in three hundred pounds. The trial had proceeded upon the former precedents upon the subject of wagers in the English courts. There was a motion in arrest of judg-

ment, which came on to be heard the next year. In the mean time the case had "made a great noise all over Europe." The powerful mind of the great judge who had presided at the trial was directed to the principles involved in the case, and in delivering his opinion upon the motion to arrest the judgment, he overwhelmed the plaintiff's case in a torrent of argument that has made the opinion a landmark in the law. He expressed his regret that on the trial the nature of the case had not been more fully considered, and that the witnesses had not been told that they might refuse to give evidence. He said that to sustain the action would be a disgrace to judicature, and that one's confidential friends, and servants, and physicians, could not be required to give evidence upon such a question as was involved in the determination of the wager.

One of the earliest English cases on the subject of wagers, of which we have a report, was a case in which a wager was laid that Charles Stuart would be King of England within twelve months then next ensuing. Upon this wager the action was maintained. This case is reported under the name of Andrews v. Herne, in 1 Levinz, and under the name of Walcott v. Tappin in 1 Keb., 56–65. In allusion to this case, justice Buller, in the celebrated case of Good v. Elliott, 3 Term Reports, 693, said: "I presume no one will say that an action could now be maintained on any bet of that kind."

The English courts, however, still sustained actions upon wagers on the most frivolous matters, notwithstanding the effort of Buller, justice, in the case of Good v. Elliott, to treat all idle wagers as void. At a later day, in the case of Henkin v. Guerss, 2 Camp. 408, Lord Loughborough refused to try an action for a wager whether a person could be held to bail on a special original for a debt under forty pounds, and the Court of King's Bench approved what he had done. (12 East., 247.) The case of Brown against Leeson, 2 H. Black., 43, was a wager concerning the manner of playing an illegal game, and the court refused to sustain the action because the inquiry was concerning a prohibited game. But Lord Loughborough said in addition: "This was a mere idle wager, and I have no hesitation in saying that I think a court or

a jury ought not to be called upon to decide such wagers." In the year 1824, the case of Eagerton v. Furzeman (1 Carr. & Payne) came up in the King's Bench, before Lord Chief Justice Abbott. The wager in that case was upon a dog fight. The chief justice said: "I certainly shall not try the case: I am of opinion that the time of the court is not to be wasted in trying which dog or which man won a battle, as the whole of these wagers are illegal."

These references will serve to show the fluctuations and the general course of English decisions on the subject before us. Even some of the later cases in which actions have been sustained in the English courts would seem very clearly to sanction immorality. Thus in the case of Bland v. Collett, 4 Camp. 157, the wager was whether a person with whom the plaintiff had conversed was Lord Kensington. The defendant, before he concluded the bet, ascertained for a certainty that the person was Lord Kingston and not Lord Kensington; but the wager was held to be good. At length in England, the legislature came to the relief of the courts, and by statutes 8th and 9th Victoria, all contracts and agreements, whether by parol or in writing, by way of gambling or wagering, are declared to be null and void; and it is provided that no suit shall be brought or maintained in any court of law or equity, for recovering any sum of money or valuable thing, alleged to be won upon any wager, or which shall have been deposited in the hands of any person to abide the event on which any wager shall have been made.

We are informed by Chancellor Kent, in his commentaries, that wager policies of insurance, without any real interests to support them, are condemned by positive ordinances in France, and in most of the commercial nations of Europe. In Scotland, no wager or gaming contract will support an action. (1 Bell's Com. 300.)

In the United States, the course of decisions on the subject of wagers has been very much the same as in England, with a stronger tendency in the later adjudications to treat all idle wagers as utterly void. Thus it has been held that a wager on a subject in which the parties have no pecuniary interest is not a valid con-

Monroe v. Smelly.

tract in New Hampshire. (3 N. H. 152; 6 N. H. 104; 12 N. H. 386.) All wagers are held to be void in the State of Maine, see 15 Me. Rep. 233. An action cannot be maintained in Pennsylvania to recover a sum of money alleged to have been lost by the defendant to the plaintiff upon a wager or bet. (Edgell v. McLaughlin, 6 Wharton; 1 Rawle 37; 3 Yeates 463.) In the case reported in 6 Wharton, Sergeant, Justice, said: that "courts of justice are instituted to determine the disputes among men necessarily arising from their existence together in society. In the innumerable contentions that human affairs originate, there is sufficient to engross the time and labor of judicial tribunals, without occupying them in the investigation of gratuitous contests, such as wagers; which flow sometimes from a spirit of gambling, sometimes from heat of passion, and sometimes from folly and indiscretion on the one side, and stratagem and cunning on the other." In Massachusetts, it is held that all gaming is unlawful, according to the general policy and laws of the commonwealth. Even in Vermont it is held that no suit will lie to recover property won of another by a bet or wager. (Collamer v. Day, 2 Vt. Rep. 144.) See also the dissenting opinion of Bennett J. in the case of the State v. Crotean, 23 Vt., 14. In the case of Rice v. Gist, (South Carolina Law Reports,) judge O'Neall delivered the opinion of the court, and said in the most emphatic language : "I am prepared hereafter to declare all wagers unlawful, on their clear immoral tendency, and thus to sweep from our courts the whole body of wagers, great and small." In another part of the opinion that distinguished judge said : "Every bet, of this or any other kind, tends directly to beget a desire of possessing another's money or property without an equivalent. Men, acted on by such influences, may easily become gamblers, and then the road to every other vice is broad and plain."

But it is unnecessary to make further reference to the American decisions. The uniform tendency of the later decisions is to treat all gaming contracts and all wagers as utterly void. We feel ourselves authorized to conform our decisions to the public policy and to the sense of morality which the modern decisions and the modern legislation on the subject of gaming and wagers

so clearly indicate. We find that the ancient rule of the common law was subject to certain exceptions; and in proportion as the courts have considered these questions, these exceptions to the ancient rule have been adjudged to be more and more comprehensive in their embrace, until, as has been said, the exceptions to the rule have taken the place of the rule itself. We think that, in the true spirit and meaning of the exceptions to the old rule, all idle wagers and all gaming contracts may be properly held to be void.

1. Because it is contrary to sound public policy that courts of justice should be required to enforce contracts into which there does not enter the element of a good or valuable consideration, in the just sense of these words. What consideration is it for the payment of a thousand dollars that one man shall leap farther than another at three leaps? If A. agrees with B. that he will pay him a thousand dollars, if a certain horse belongs to C. but if the horse belongs to B. then B. shall pay A. the like sum; where is the consideration of such a contract? There can be no consideration but the mutual risk to which each party subjects himself. And can it be said to be sound public policy to permit parties to take such risks, upon such trifling and frivolous issues? We think not.

2. We think that it certainly tends to the detriment of the public, that the time of the courts should be consumed in the investigation of the most idle or frivolous matters, about which the parties who lay the wager have no interest, to the delay of causes of the greatest magnitude perhaps, and certainly to the delay of the ordinary business transactions of life.

Lastly, because a great majority of wagers are immoral in their tendency, in a plain and direct sense; and they all beget a desire, as was said by judge O'Neall, to possess another's money or property without an equivalent, and this, if not an immorality in itself, opens the way to vice. It might not attract much attention for this court to render a judgment against a man for a thousand dollars lost at ten pins, or on the turn of a card, or on the issue of a fight between two dogs, but if a dozen such judgments should be rendered at every term of this court for the next five years,

Monroe v. Smelly.

it would be a blot upon the jurisprudence of the State from which it would not recover in half a century; and it might present to the people the spectacle of the courts prostituted to the odious instrumentality of stripping women and children of the common comforts of life because some one who owed them support and protection had been capricious enough to stake his substance upon a wager that he could throw a stone a thousand feet. In the case of Conner v. Mackey, 20 Tex., 747, this court held that money won at a game with cards called poker could not be recovered, and the decision was put on the general ground that gaming with cards tends to immorality. See also the case of Norvell v. Oury, 13 Tex., 31. We can perceive no difference in principle between the case of Conner v. Mackey, and this case. It is true that the game of ten pins is a licensed game, but it is not licensed for the purpose of gambling. The whole of our legislation on the subject of gaming shows that it has always been the policy of this State to prohibit and to punish it. We cannot see, therefore, that a wager upon a game licensed by law, stands on any different footing from a wager upon any indifferent matter.

This court has sustained wagers upon horse races upon the idea that they rested upon somewhat different grounds, as respects their policy, from other wagers. It may be too late to question the wisdom and soundness of those decisions. But we are not disposed to go any further in sustaining actions upon wagers, or to recover money or property won upon any game or wager. The judgment of the District Court is therefore affirmed.

Judgment affirmed.